# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO:  19-** |
| v. | : | **DATE FILED:** |
| ANDREW M. BERKOWITZ | | **VIOLATIONS:** |
| | : | **18 U.S.C. § 1347 (health care fraud – 19 counts)** |
| | : · | **21 U.S.C. § 841(a) (1) (distribution of controlled substances – 23 counts)** |
| | : | **Notice of forfeiture** |

## INDICTMENT

## COUNTS ONE THROUGH NINETEEN
### (Health Care Fraud)

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

1.      Defendant ANDREW M. BERKOWITZ was a medical doctor licensed to practice medicine in the Commonwealth of Pennsylvania.  Defendant BERKOWITZ held Pennsylvania medical license number MD036462E and DEA registration number BB0569333. Defendant ANDREW M. BERKOWITZ owned Bucks Philadelphia Medical Care Group, LTD (hereinafter referred to as "BPMCG"), and Tri-County Healthcare Institute LLC (hereinafter referred to as "Tri-County").  BPMCG and Tri-County processed claims and payments for defendant BERKOWITZ's medical practice.

2.      A non-pharmacy dispensing site (hereinafter referred to as a "NDS") is a location other than a pharmacy that dispenses medical preparations under the supervision of a physician to patients for self-administration.  A physician with a registered NDS is permitted to

dispense prescription drugs for the patient's benefit.  Beginning in or about August 2014,

BPMCG registered as a NDS.

3.       Defendant ANDREW M. BERKOWITZ operated a medical practice

under the name A+ Pain Management (hereinafter referred to as "A+")[1] located at 10745

Haldeman Avenue, Philadelphia, PA 19116.  A+ offered pain management and addiction

treatment services.  As part of its pain management practice, A+ provided on-site chiropractic,

acupuncture, physical therapy, and prescription drug dispensing.

4.       Defendant ANDREW M. BERKOWITZ was the only licensed physician

at A+.  Defendant BERKOWITZ saw patients during the limited hours of 6:30 PM to 9:30 PM

on Tuesdays; 3 PM to 6 PM on Wednesdays; and Noon to 6 PM on Thursdays.

5.       Defendant ANDREW M. BERKOWITZ submitted claims, and caused the

submission of claims through BPMCG and Tri-County, to insurers each of which was a health

care benefit program as defined by Title 18, United States Code, Section 24(c), in that each was a

public or private plan or contract, affecting commerce, under which medical benefits and

services were provided to individuals.  The insurers included but were not limited to Medicare,

Independence Blue Cross (hereinafter referred to as "IBC"), Aetna, and Travelers Insurance

(collectively, "the insurers").  Claims were submitted electronically or by mail to the insurers,

approved by the insurers, and paid by wire transferring funds to accounts titled to BPMCG and

Tri-County or by mailing a check to BPMCG and Tri-County.

6.       All claims submitted to the insurers were required to include the

provider's unique 10-digit National Provider Identifier (hereinafter "NPI").  Defendant

ANDREW M. BERKOWITZ obtained NPI numbers for himself (NPI number 1952454928);

---

[1]        A+ was owned by BPMCG.

BPMCG (NPI number 1679626642 for professional service claims; and NPI number 1134528839 for pharmacy service claims); and Tri-County (NPI number 1609249952 and NPI number 1982981338).

7.      From in or about January 2015 through in or about April 2019, defendant ANDREW M. BERKOWITZ, through BPMCG and Tri-County, fraudulently billed the insurers for medically unnecessary services, and for services not rendered. During the same period, defendant BERKOWITZ distributed controlled substances outside the usual course of professional practice and without a legitimate medical purpose.

**The Insurers**

The Medicare Program

8.      Medicare is a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind and disabled. The benefits available under Medicare are governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversees and administers Medicare. Individuals who receive benefits under Medicare were commonly referred to as Medicare "beneficiaries."

9.      Medicare programs covering different types of benefits are separated into different program "parts." Part D of Medicare subsidizes the costs of prescription drugs for Medicare beneficiaries in the United States. Medicare Part D was established by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 and went into effect on January 1, 2006.

10.      Medicare Part D provides subsidized prescription drug insurance coverage to qualifying Medicare beneficiaries. Drugs covered by Medicare Part D included only those

medications that were prescribed for a medically accepted indication and that were medically necessary for the Medicare beneficiary.

## Independence Blue Cross

11.     Independence Blue Cross ("IBC") is a private health insurance company based in Philadelphia, Pennsylvania. IBC is an independent corporation that is part of the Blue Cross and Blue Shield Organization, which consists of a nationwide federation of independent corporations. IBC provides a variety of managed health care service insurance plans, including prescription drug coverage. IBC paid for medical services and prescription drugs that were medically necessary for the program member.

## Travelers Insurance

12.     Travelers is the third-largest writer of personal insurance in the United States. The company has field offices in every U.S. state. Travelers, through its subsidiaries and approximately 14,000 independent agents and brokers, provides commercial and personal property and casualty insurance products and services to businesses, government units, associations, and individuals. The company's automobile insurance offering includes medical payment coverage for injuries related to auto accidents.

## Aetna

13.     Aetna is a private health insurance company based in Hartford, Connecticut. Aetna offers medical, prescription drugs, dental, behavioral health, long-term care, and disability plans, primarily through employer-paid (fully or partly) insurance and benefit programs, and through Medicare. The company operates a nation-wide network of approximately 22.1 million medical members, 12.7 million dental members, 13.1 million pharmacy benefit management services members, and 1,200,000 health-care professionals.

Aetna paid for health care services and prescription drugs that were medically necessary for the program member.

**The Controlled Substances Act**

14.     The Controlled Substances Act governs the manufacture, distribution, and dispensing of controlled substances in the United States.  Under the Controlled Substances Act, there are five schedules of controlled substances Schedules I, II, III, IV, and V.  Controlled substances are scheduled into these levels based upon their potential for abuse, among other things.  For example, abuse of Schedule II controlled substances may lead to severe psychological or physical dependence.  Abuse of Schedule III controlled substances may lead to moderate or low physical dependence or high psychological dependence.  Abuse of Schedule IV controlled substances may lead to more limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule III.

15.     Oxycodone is an opioid medication used to treat severe pain. Oxycodone is a Schedule II controlled substance that has been associated with addiction and abuse. Oxycodone can cause life threatening conditions or death, especially if used in combination with other drugs or alcohol.

16.     Tramadol is a synthetic opioid medication used to treat moderate pain. Quazepam and Eszopiclone are sedatives indicated for the treatment of insomnia. Tramadol, Quazepam, and Eszopiclone are Schedule IV controlled substances that have been associated with addiction, abuse, and misuse.

17.     Title 21, United States Code, Section 841(a)(1), provides that "[e]xcept as

authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

18.     Title 21, United States Code, Section 802(10), provides that the term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for delivery.

19.     Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations …relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances."

20.     The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of 21 Code of Federal Regulations § 1306.04, governing the issuance of prescriptions, which provides, among other things, that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  Moreover, an order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the law relating to controlled substances.

21. The Pennsylvania Code of Professional and Vocational Standards, Title 49, Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania to prescribe or dispense controlled substances. Chapter 16.92 provides in pertinent part:

(a) A person licensed to practice medicine and surgery in this Commonwealth or otherwise licensed or regulated by the Board, when prescribing, administering or dispensing controlled substances, shall carry out, or cause to be carried out, the following minimum standards:

 (1) Initial medical history and physical examination.... [B]efore commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial examination shall be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding thirty days. The physical examination shall include an evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.

 (2) Reevaluations. Among the factors to be considered in determining the number and the frequency of follow-up evaluations that should be recommended to the patient are the condition diagnosed, the controlled substance involved, expected results and possible side effects. For chronic conditions, periodic follow-up evaluations shall be recommended to monitor the effectiveness of the controlled substance in achieving the intended results.

 (3) Patient counseling. Appropriate counseling shall be given to the patient regarding the condition diagnosed and the controlled substance prescribed, administered or dispensed. Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of use and possible side effects.

 (4) Medical Records. [C]ertain information shall be recorded in the patient's medical record on each occasion when a controlled substance is prescribed, administered or dispensed. This information shall include the

7

name of the controlled substance, its strength, the quantity and the date it was prescribed, administered or dispensed to a patient. The medical record shall also include a specification of the symptoms observed and reported, the diagnosis of the condition for which the controlled substance is being given and the directions given to the patient for the use of the controlled substance. If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

22.     As a doctor of medicine, defendant ANDREW M. BERKOWITZ was authorized to dispense to patients Schedules II, III, IV and V controlled substances and to prescribe medicine to patients, including controlled substances, for legitimate medical purposes and in the usual course of professional practice.

## THE HEALTH CARE FRAUD SCHEME

### Manner and Means

It was part of the scheme to defraud that:

23.     Defendant ANDREW M. BERKOWITZ submitted, or caused to be submitted, fraudulent claims to insurers for medically unnecessary services, including physical therapy, acupuncture, and chiropractic treatments, administered at A+. Defendant BERKOWITZ also submitted, or caused to be submitted, claims for services not provided at all.

24.     Defendant ANDREW M. BERKOWITZ submitted, or caused to be submitted, fraudulent claims to insurers for medically unnecessary prescription drugs dispensed by BPMCG. Defendant BERKOWITZ dispensed prescription drugs through BPMCG for profit without any meaningful assessment of the impact on the patient's condition.

25.     Defendant ANDREW M. BERKOWITZ supplied patients with a so-called "goodie bag", that was a tote bag bearing the A+ logo, containing multiple prescription drugs

dispensed by BPMCG, and for which BPMCG billed insurers. For each "goodie bag" dispensed, BPMCG submitted claims for reimbursement totaling from approximately $1,388 to approximately $11,259.

26. Defendant ANDREW M. BERKOWITZ supplied patients with prescription drugs dispensed by BPMCG without dosing directions, and information regarding benefits; side-effects; and possible interaction between the drugs. The "goodie bags" typically included a combination of (1) Topical Analgesics, such as Relyyt and/or Lidocaine; (2) Muscle Relaxers, such as Chlorzoxazone and/or Cyclobenzaprine; (3) Anti-Inflammatories, such as Celecoxib and/or Nalfon; and (5) Schedule IV controlled substances, such as Tramadol for pain; and/or Eszopiclone and Quazepam for insomnia and anxiety.

27. For patients covered by private insurers, which generally reimbursed at higher rates than federally funded programs, defendant ANDREW M. BERKOWITZ supplied a "goodie bag" at virtually every visit. For example, on or about July 2, 2015, Person 1, who is known to the grand jury, sought treatment from defendant BERKOWITZ for a back injury. Person 1 had IBC insurance. At the first visit, Person 1 was handed a tote bag of prescription drugs dispensed by BPMCG. When Person 1 inquired about the purpose of the drugs, and repeatedly attempted to refuse the bag, defendant BERKOWITZ instructed Person 1 to "go home and try these." The bag contained RelyyT patches; Relyyks patches; Celecobix; Cyclobenzaprine; Tramadol; and Quazepam. Defendant BERKOWITZ did not examine Person 1; take a medical history; offer a diagnosis; nor provide information about these drugs. BPMCG billed IBC approximately $11,259 for medically unnecessary prescription drugs dispensed to Person 1 on July 2, 2015, for which IBC paid approximately $4,337.

28.     In furtherance of the scheme, defendant ANDREW M. BERKOWITZ would prescribe Oxycodone to "pill-seeking" patients in exchange for tacit approval that he would submit excessive claims to the patient's insurer for medically unnecessary prescription drugs and other services.

29.     Person 2, who is known to the grand jury, sought treatment from defendant ANDREW M. BERKOWITZ after his physician refused to continue prescribing him Oxycodone.  Person 2 had IBC insurance.  From on or about March 3, 2015 through on or about September 1, 2016, Person 2 obtained a monthly supply of Oxycodone (10 mg) from defendant BERKOWITZ.  In exchange for the Oxycodone prescriptions, at each appointment Person 2 accepted a duffle bag of medically unnecessary prescription drugs, including Eszopiclone; Celecoxib; Diclofenac; Lidocaine Pads and Lidocaine Ointment; Tramadol; and Cyclobenzaprine.  From in or around March 2015 through in or around September 2016, BPMCG submitted claims to IBC totaling at least approximately $141,329 for medically unnecessary prescription drugs dispensed to Person 2, for which IBC paid at least approximately $58,009.

30.     From in or about April 2017 through in or about September 2017, Person 3, who is known to the grand jury, scheduled appointments with defendant ANDREW M. BERKOWITZ to obtain Oxycodone.  At the first appointment, defendant BERKOWITZ inquired about Person 3's insurer.  Person 3, who claimed to be uninsured, suggested the possibility to obtaining Medicaid coverage for his treatment.  But, defendant BERKOWITZ advised "the Medicaid thing doesn't work for us."  After asking Person 3, "What kind of medication are you looking for?" defendant BERKOWITZ agreed to prescribe, and did prescribe, Oxycodone (5 mg) for Person 3.  Defendant BERKOWITZ did not take a medical

history or evaluate Person 3's heart, lungs, blood pressure, body functions, or provide counseling about dosage levels, instructions for use, frequency and duration of use, and possible side effects before prescribing Oxycodone. Person 3 paid $185 cash for the appointment.

31.     At the next appointment, Person 3 presented IBC insurance. This time, in addition to Oxycodone (5 mg), Person 3 was supplied a tote bag containing Nalfon; Tramadol; and Cyclobenzaprine, dispensed by BPMCG. As before, defendant ANDREW M. BERKOWITZ did not take any vital signs or provide counseling even though defendant BERKOWITZ prescribed a Schedule IV controlled substance, Tramadol, with Oxycodone. At each subsequent appointment, Person 3 obtained Oxycodone (5 mg) and a bag of prescription drugs. BPMCG submitted claims to IBC for the medically unnecessary prescription drugs dispensed to Person 3 totaling approximately $8,969, for which IBC paid approximately $4,975.

32.     From in or about May 2018 through in or about April 2019, Person 4, who is known to the grand jury, scheduled appointments with defendant ANDREW M. BERKOWITZ to obtain Oxycodone. Person 4 presented IBC insurance. At the first appointment, Person 4 asked for Oxycodone, to which defendant BERKOWITZ responded, "I'll do three a day of the tens" referring to Oxycodone (10 mg). Defendant BERKOWITZ did not take a medical history or evaluate Person 4's heart, lungs, blood pressure and body functions, or provide counseling about dosage levels, instructions for use, frequency and duration of use, and possible side effects before prescribing Oxycodone. Defendant BERKOWITZ advised Person 4 that he had a pharmacy on-site so he would also prescribe a muscle relaxer and pain patches. At that visit and subsequent visits, Person 4 obtained Oxycodone (10 mg); and a tote bag containing two bottles of Chlorzoxazone and four boxes of Lidocaine ointment. BPMCG billed IBC a total of approximately at least $49,620 for the medically unnecessary prescription drugs for Person 4,

for which IBC paid a total of approximately $28,192.

33.     In all, and by the above means, defendant ANDREW M. BERKOWITZ

caused fraudulent claims to insurers for medically unnecessary services and prescription drugs.

From on or about January 1, 2015 through on or about December 31, 2018, defendant

BERKOWITZ billed insurers approximately $9.1 million for prescription drugs dispensed by

BPMCG, for which he obtained payments from the insurers of approximately $3.2 million.

34.     From on or about January 1, 2015 through on or about December 31,

2018, in the Eastern District of Pennsylvania, defendant

**ANDREW M. BERKOWITZ**

knowingly and willfully executed, and aided and abetted, a scheme and artifice to defraud health

care benefit programs in connection with the delivery of or payment for health care benefits,

items, or services, by means of false and fraudulent pretenses, representations, and promises,

money and property owned by and under the custody and control of health care benefit

programs, including Medicare, Independence Blue Cross, Aetna, and Travelers Insurance, each

of which is a health care benefit program affecting commerce, as defined in Title 18, United

States Code, Section 24(b), by submitting and causing to be submitted fraudulent health care

insurance claims for pharmacy services that were not medically necessary, and that the defendant

knew were not reimbursable, including fraudulent claims on each of the dates listed below (each

constituting a separate count of this indictment):

| COUNT | PROGRAM | APPROXIMATE DATE OF CLAIM | APPROXIMATE AMOUNT OF CLAIM | APPROXIMATE AMOUNT PAID |
|---|---|---|---|---|
| 1 | IBC | July 2, 2015 | $11,259.45 | $4,337.53 |
| 2 | IBC | March 29, 2016 | $3,873.19 | $2,323.82 |
| 3 | IBC | June 21, 2016 | $6,157.39 | $3,686.40 |
| 4 | IBC | May 24, 2017 | $1,388.50 | $ 780.53 |
| 5 | IBC | June 21, 2017 | $1,895.17 | $1,048.66 |
| 6 | IBC | July 19, 2017 | $1,895.17 | $1,048.66 |
| 7 | IBC | August 16, 2017 | $1,895.17 | $1,048.66 |
| 8 | IBC | September 15, 2017 | $1,895.17 | $1,048.66 |
| 9 | IBC | May 31, 2018 | $4,614.60 | $2,602.71 |
| 10 | IBC | June 28, 2018 | $4,614.60 | $2,612.01 |
| 11 | IBC | July 26, 2018 | $4,614.60 | $2,612.01 |
| 12 | IBC | August 23, 2018 | $4,614.60 | $2,612.01 |
| 13 | IBC | October 18, 2018 | $4,614.60 | $2,394.95 |
| 14 | IBC | November 15, 2018 | $4,614.60 | $2,394.95 |
| 15 | IBC | December 20, 2018 | $4,614.60 | $2,333.84 |
| 16 | IBC | January 17, 2019 | $4,689.54 | $2,586.33 |
| 17 | IBC | February 14, 2019 | $4,614.60 | $2,583.60 |
| 18 | IBC | March 14, 2019 | $4,007.56 | $2,586.08 |
| 19 | IBC | April 18, 2019 | $4,007.56 | $2,586.08 |

All in violation of Title 18, United States Code, Section 1347.

## COUNTS TWENTY THROUGH FORTY TWO
### (Distribution of Controlled Substances)

**THE GRAND JURY FURTHER CHARGES THAT**:

At all times material to this indictment:

1.    Paragraphs 1 through 33 of Count One are incorporated here.

2.    On or about each of the dates listed below, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### ANDREW M. BERKOWITZ

knowingly and intentionally distributed and dispensed, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of a Schedule II or Schedule IV controlled substance (each distribution constituting a separate count of this indictment):

| COUNT | APPROXIMATE DATE OF PRESCRIPTION | SUBSTANCE | QUANTITY |
|---|---|---|---|
| 20 | July 2, 2015 | Tramadol (150 mg) | 60 |
|  |  | Quazepam (15 mg) | 30 |
| 21 | March 3, 2016 | Oxycodone (10 mg) | 46 |
| 22 | March 12, 2016 | Oxycodone (10 mg) | 46 |
| 23 | March 15, 2016 | Oxycodone (10 mg) | 46 |
| 24 | March 29, 2016 | Oxycodone (10 mg) | 46 |
|  |  | Eszoplicone ( 1 mg) | 30 |
|  |  | Tramadol (150 mg) | 60 |
| 25 | August 16, 2016 | Oxycodone (10 mg) | 46 |
|  |  | Eszoplicone ( 1 mg) | 30 |
|  |  | Tramadol (150 mg) | 30 |
| 26 | May 24, 2017 | Oxycodone (5 mg) | 80 |
|  |  | Tramadol (150 mg) | 30 |
| 27 | June 21, 2017 | Oxycodone (5 mg) | 84 |
|  |  | Eszoplicone (1 mg) | 30 |
|  |  | Tramadol (150 mg) | 30 |

| COUNT | APPROXIMATE DATE OF PRESCRIPTION | DRUG STRENGTH | QUANTITY |
|---|---|---|---|
| 28 | July 19, 2017 | Oxycodone (5 mg) | 84 |
| | | Eszoplicone (1 mg) | 30 |
| | | Tramadol (150 mg) | 30 |
| 29 | August 16, 2017 | Oxycodone (5 mg) | 84 |
| | | Eszoplicone (1 mg) | 30 |
| | | Tramadol (150 mg) | 30 |
| 30 | September 15, 2017 | Oxycodone (5 mg) | 84 |
| | | Eszoplicone (1 mg) | 30 |
| | | Tramadol (150 mg) | 30 |
| 31 | May 31, 2018 | Oxycodone (10 mg) | 86 |
| 32 | June 28, 2018 | Oxycodone (10 mg) | 86 |
| 33 | July 26, 2018 | Oxycodone (10 mg) | 86 |
| 34 | August 23, 2018 | Oxycodone (10 mg) | 43 |
| 35 | September 20, 2018 | Oxycodone (10 mg) | 86 |
| 36 | October 18, 2018 | Oxycodone (10 mg) | 92 |
| 37 | November 15, 2018 | Oxycodone (10 mg) | 92 |
| 38 | December 20, 2018 | Oxycodone (10 mg) | 92 |
| 39 | January 17, 2019 | Oxycodone (10 mg) | 92 |
| 40 | February 14, 2019 | Oxycodone (10 mg) | 92 |
| 41 | March 14, 2019 | Oxycodone (10 mg) | 92 |
| 42 | April 18, 2019 | Oxycodone (10 mg) | 92 |

All in violation of Title 21, United States Code, Section 841(a)(1).

15

## NOTICE OF FORFEITURE # 1

**THE GRAND JURY FURTHER CHARGES THAT:**

     1.     As a result of the violation of Title 18, United States Code, Section 1347, set forth in this indictment, defendant

### ANDREW M. BERKOWITZ

shall forfeit to the United States of America any property that constitutes or is derived from gross proceeds traceable to the commission of such offense.

     2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

     (a)     cannot be located upon the exercise of due diligence;

     (b)     has been transferred or sold to, or deposited with, a third party;

     (c)     has been placed beyond the jurisdiction of the Court;

     (d)     has been substantially diminished in value; or

     (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

     All pursuant to Title 18, United States Code, Section 982(a)(7).

16

## NOTICE OF FORFEITURE # 2

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     As a result of the violations of Title 21, United States Code, Sections 846 and 841(a)(1) set forth in this indictment, defendant

### ANDREW M. BERKOWITZ

shall forfeit to the United States of America:

      (a)     any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses;

      (b)     any property constituting, or derived from, proceeds obtained directly or indirectly from the commission of such offenses, including but not limited to:

      i.     A sum of money in United States currency representing the amount of proceeds obtained as a result of the violations of the Controlled Substances Act.

      2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

      (a)     cannot be located upon the exercise of due diligence;

      (b)     has been transferred or sold to, or deposited with, a third party;

      (c)     has been placed beyond the jurisdiction of the Court;

      (d)     has been substantially diminished in value; or

      (e)     has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the

property subject to forfeiture.

All pursuant to Title 21, United States Code, Section 853.

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

for **WILLIAM M. MC SWAIN**
**UNITED STATES ATTORNEY**

18