## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 19-356** |
| v. | : | |
| | : | |
| **ANDREW M. BERKOWITZ** | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S PRO SE HABEAS PETITION

The United States of America, by its attorneys, William M. McSwain, United States Attorney, and M. Beth Leahy and Anthony D. Scicchitano, Assistant United States Attorneys, hereby respond in opposition to defendant's pro se petition under 28 U.S.C. § 2241 seeking to withdraw his guilty plea based on claims of legal and factual innocence; coercion; and ineffective assistance of counsel.

For reasons explained below, Section 2241 is not applicable. And, even if the Court construed Berkowitz's petition as a motion to withdraw his guilty plea, Berkowitz cannot prevail. Berkowitz has not provided a fair and just reason to withdraw his counseled guilty plea which the Court determined he entered knowingly, intentionally, and voluntarily, and was supported by a sufficient factual basis. Berkowitz offers nothing that controverts the Court's findings. His petition should be denied in its entirety.

### I.       Factual Background.

On June 27, 2019, an indictment was unsealed charging the defendant with 19 counts of healthcare fraud, in violation of 18 U.S.C. § 1347, and 23 counts of distribution of Schedule II

1

and Schedule IV controlled substances, in violation of 21 U.S.C. § 841, arising from a four-year scheme fraud whereby the defendant illegally prescribed medically unnecessary controlled substances and submitted fraudulent claims to health care benefit programs totaling approximately $9,376,214. Among other evidence, the FBI made 17 recordings of Berkowitz interacting with undercover FBI sources which showed unequivocally that Berkowitz had illegally prescribed controlled substances and submitted fraudulent claims to health care benefit programs.

Berkowitz retained Richard Hark, Esq. who entered his appearance on July 18, 2019. [Doc. No. 10]. On September 4, 2019, the government filed a motion requesting a hearing on conflicts of interest facing Mr. Hark arising from his prior representation of a coconspirator in the case. [Do. No. 24]. Following a hearing on the conflict, Mr. Hark withdrew from the case and Berkowitz retained Marc Neff, Esq. [Doc. No. 35].[1]

On or about November 18, 2019, the parties effectuated a written guilty plea agreement. Berkowitz agreed to plead guilty to all charges in the indictment. The parties entered into certain factual stipulations that would impact the calculation of Berkowitz's sentencing guidelines. The written agreement explicitly stated that the parties were free to argue the applicability of any other provision of the Sentencing Guidelines, including offense conduct, offense characteristics, criminal history, adjustments, and departures; and that the parties' stipulations were not binding upon either the Probation Office or the Court; and that the Court could make factual and legal determinations that differed from the parties' stipulations which could result in an increase or

---

[1] On October 1, 2019, the Court granted Mr. Hark's motion to withdraw from the case. [Doc. No. 38].

decrease in the Sentencing Guidelines range and the sentence that may be imposed. The plea agreement also anticipated a global settlement for restitution and civil penalties totaling approximately $6.3 million. In exchange for payment of these penalties prior to sentencing, the government agreed it would not pursue criminal forfeiture of approximately $3.4 million.

On January 24, 2020, almost two months after Berkowitz signed the plea agreement, he appeared before the Court to enter his guilty plea. *See* Exhibit A, Guilty Plea Transcript, [referenced herein as "GPT"]. At the outset of the proceedings, the defendant was sworn under oath. [GPT, p. 3]. The Court advised the defendant that because he was under oath "that the answers you give to my questions will be subject to penalties of perjury or making a false statement if you do not tell the truth." [GPT, p. 3]. Berkowitz acknowledged that he understood the Court's advisory. [GPT, p. 3]. The Court then proceeded to conduct a comprehensive colloquy to ascertain that Berkowitz was competent to enter a plea; that his decision to plead guilty was knowing, intentional and voluntary; and that there was a sufficient factual basis for the plea. [GPT, p. 4]. In response to the Court's inquiry, the defendant affirmed that no one had instructed him to respond untruthfully to any of the Court's questions. [GPT, p. 4].

The Court further ascertained that the defendant graduated from medical school and practiced as a physician; that he was being treated for common medical issues including atrial fibrillation and hypertension, restless leg syndrome, sleep apnea, situational depression, and osteoporosis, none of which interfered with his ability to understand the proceedings. [GPT, p. 4-11]. The defendant informed the Court that he had mild hearing loss, but that he could clearly hear what was being said during the proceedings. [GPT, p. 11].

As part of the colloquy, Berkowitz affirmed that he had ample opportunity to discuss his

3

case with Mr. Neff, and that he was satisfied with Mr. Neff's representation. [GPT, p. 11]. Berkowitz further acknowledged that the understood the crimes charged and the terms of the guilty plea agreement. [GPT, p. 13-15]. Berkowitz affirmed that no one had made any promise or given an assurance of any kind that was not in the guilty plea agreement in an effort to persuade or induce him to accept the agreement or to plead guilty in this case. [GPT, p. 16]. Berkowitz affirmed that he thoroughly read and understood the terms of the written plea agreement. [GPT, p. 15].

As directed by the Court, the government attorney read aloud pages 4-10 of the Guilty Plea Memorandum which recited the government's evidence and provided a factual basis for Berkowitz's guilty plea. [GPT, p. 17-28]. Berkowitz affirmed that the government attorney accurately described the facts of the case. [GPT, p. 28]. Berkowitz declined to make any changes or corrections to the factual basis offered by the government. I do not." [GPT, p. 28]. He affirmed that he was pleading guilty as charged because he was guilty of those crimes. [GPT, p. 28-29]. After completing the colloquy, the Court found "the defendant is competent to plead, that his plea of guilty is voluntary and not the result of force or threats or any promises apart from the plea agreement disclosed on this record, that there is a factual basis for the plea of guilty, that the defendant understands the charges against him, his legal rights, the maximum possible penalty and mandatory minimum penalty and that the defendant understands he's waiving his right to a trial." [GPT, p. 43]. Based on those findings, the Court accepted Berkowitz's guilty plea.

After hearing argument, the Court revoked Berkowitz's bail and remanded him to the custody of the United States Marshal pending sentencing. On February 14, 2020, the defendant filed a motion to reinstate bail [Doc. No. 53], which the Court denied on March 2, 2020 [Doc.

No. 57].

On April 1, 2020, Mr. Neff sought permission to withdraw from the case [Doc. No. 58], which the Court denied without prejudice. [Doc. No. 59]. On April 17, 2020, Berkowitz, through counsel, again petitioned for release pending sentencing time citing COVID-19 risks. [Doc. No. 61]. On May 4, 2020, the Court denied Berkowitz's motion. [Doc. No. 68]. Mr. Neff again sought the Court's permission to withdraw as Berkowitz's attorney. [Doc. No. 69]. A hearing on counsel's motion is set for August 19, 2020. [Doc. No. 75].

On July 9, 2020, Berkowitz, while still represented, filed the current pro se petition. [Doc. No. 77] in which he alleges[2] that he is legally and factually innocent; that he was coerced to plead guilty; and that his counsel rendered ineffective assistance. [Def. Mtn., p. 9-15]. Berkowitz's allegations are in stark contradiction to his sworn testimony before this Court on January 24, 2020.

## II.      Section 2241.

As an initial matter, Berkowitz cannot seek relief through a section 2241 habeas petition. Section 2241 "confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the execution of his sentence." *Coady v. Vaughn*, 251 F.3d 480 (3d Cir.2001). A federal prisoner can seek relief under 28 U.S.C. § 2241 if the remedy provided by 28 U.S.C. § 2255 (which allows s federal prisoner in custody to attack his sentence on

---

[2] For some indeterminate reason, Berkowitz references "Docson's Militia," Pennsylvania Constitution Article I § 4 Religion, and populist conspiracy theories about Andrew Weissman, Peter Strzok, and Lisa Page, who Berkowitz claims manipulated FBI 302's to "extort a plea deal" from General Flynn by having him 'admit to a crime that is impossible." Def. Mtn., p. 2-3. Although Berkowitz's pleading is rambling and convoluted, the undersigned have diligently attempted to identify, and respond to, what seem to be his core claims.

constitutional grounds) is "inadequate or ineffective" to test the legality of his or her detention. *Cradle v. U.S. ex rel. Miner,* 290 F.3d 536, 538 (3d Cir.2002); *Okereke v. United States,* 307 F.3d 117, 120 (3d Cir.2002). This occurs "only where the petitioner demonstrates that some limitation of scope or procedure would prevent" the petitioner from receiving adequate adjudication of his or her claims. *Cradle,* 290 F.3d at 538. This exception is extremely narrow and applies only in rare circumstances. *See, e.g., In re Dorsainvil,* 119 F.3d 245, 251–52 (3d Cir.1997) (applying exception where an intervening change in the law decriminalized the conduct underlying the petitioner's conviction). Since Berkowitz has not yet been sentenced, 2241 and 2255 are not available.

The proper vehicle for Berkowitz's claim is through a pretrial motion. When a defendant is awaiting trial, the appropriate mechanisms for challenging the legality of an arrest, the constitutionality of the government's actions, or the admissibility of evidence are pretrial motions. *See Gov't of the Virgin Islands v. Bolones,* 427 F.2d 1135, 1136 (3d Cir.1970) (per curiam). See also *Ryan v. Scism,* 445 Fed. Appx. 580 (3d Cir. 2011) (unpublished opinion) (defendant was not permitted to rescind his plea agreement through a 2241 proceeding). Berkowitz does not state a cognizable claim under 2241. Accordingly, his petition must be denied.

### III.   <u>Motion to Withdraw Guilty Plea.</u>

Even if Berkowitz's petition was construed as a motion to withdraw his guilty plea, the motion fails. A criminal defendant has no automatic right to withdraw his guilty plea under Federal Rule of Criminal Procedure 11(d). *United States v. Martinez,* 785, F2d 111,113 (3d Cir. 1986). A guilty plea is a "grave and solemn act," which is 'accepted only with care and

discernment." *Government of the Virgin Islands v. Berry,* 631 F.2d 214, 221 (3d Cir 1980

(quoting *Brady v. United States,* 397 U. S.742, 748 (1970)). A defendant whose guilty plea has

been accepted by the district court after the inquiry required by the Federal Rules of Criminal

Procedure may not lightly withdraw the plea. *United States v. Hyde,* 520 U.S. 670, 676 (1997);

*United States v. Jones,* 336 F.3d 245, 252 (3d Cir.2003); *accord United States v. Barker,* 514

F.2d 208, 221 (D. C. Cir.1975) (a guilty plea is not "a mere gesture, a temporary and

meaningless formality reversible at the defendant's whim.")

Federal Rule of Criminal Procedure 11(d)(2)(B) provides that "[a] defendant may

withdraw a plea of guilty or nolo contendere, after the court accepts the plea, but before it

imposes sentence, if …the defendant can show a fair and just reason for requesting the

withdrawal." Fed R. Crim. P. 11(d)(2)(B). The defendant bears the burden of demonstrating a

fair and just reason, and that burden is substantial. *Jones,* 336 F.3d at 252. In evaluating a motion

to withdraw a guilty plea, a court must consider: (1) whether the defendant asserts his innocence;

(2) whether the government would be prejudiced by the withdrawal; and (3) the strength of the

defendant's reasons to withdraw the plea. *United States v. Brown,* 250 F.3d at 811, 815 (3d Cir.

2001)

**A. The Defendant Has Failed to Meaningfully Assert Innocence.**

As a threshold matter, before being permitted to withdraw a guilty plea, a defendant must

reassert innocence, and must "buttress" the assertion with facts in the record that support a

claimed defense. *Brown,* 250 F.3d at 818. A bald claim of innocence is insufficient. *Id.*; *United

States v. Torres,* 129 F.3d 710, 715 (2d Cir. 1997) (defendant's "bald statements that simply

contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty

7

plea."). A defendant who moves to withdraw his guilty plea must also explain why contradictory positions were taken under oath at the guilty plea hearing. *United States v. Jones*, 979 F.2d 317, 318 (3d Cir.1992); *see Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). "The representations of the defendant, his lawyer, and the prosecutor at [a guilty plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.* (internal citations omitted). Thus, Berkowitz must set forth reasons that are not only technically sufficient, but also credible. In doing so, he has the burden of overcoming his own repeated assertions, under oath, at his plea colloquy. Under these circumstances, Berkowitz utterly fails to "buttress" his claimed defense with any support in the record and fails to credibly explain why he took a contradictory position at his guilty plea hearing, both of which requirements he needs to satisfy to withdraw his guilty plea.

Berkowitz asserts that he is legally and factually innocent of the drug and health care fraud charges because the government cannot prove *mens rea*. For the drug charges, Berkowitz characterizes the evidence against him as "failing to do a full examination of a patient" which he argues does not impute *mens rea* [Def. Mtn., p. 9, 12]. As to health care fraud, Berkowitz implies he was unaware of fraudulent billing because he "trusted his CFO in his Medicare billing." [Def. Mtn., p. 9-11]. Berkowitz completely ignores the overwhelming evidence against him, which includes his own recorded statements that show his knowledge and criminal intent.

Although Berkowitz's drug and fraud scheme was pervasive throughout his practice, the

indictment charged Berkowitz's interactions with four individuals identified as Person 1, Person 2, Person 3, and Person 4 (Person 3 and Person 4 were FBI sources who made 17 undercover recordings) to whom Berkowitz prescribed, and also dispensed, combinations of controlled substances in order to submit fraudulent claims. In these instances, Berkowitz did not provide any medical care at all. [GPT, p. 17-28]. As recited at the plea hearing, Berkowitz made the following noteworthy statements, among others, demonstrating his consciousness of guilt. He was also recorded on videotape asking Person 4 to authorize a fraudulent claim for chiropractic services:

> MS. LEAHY: "At Person 3's first appointment for which Person 3 paid $185 cash, the defendant asked Person 3, what kind of medication are you looking for. The defendant offered to write a prescription but cautioned, showing consciousness of guilt, the news has been saying that I'm a glorified drug pusher. They're saying it's the biggest problem other than ISIS. So the DEA is all over me like white on rice. And (referring to himself), Jews do very poorly in prison."

[GPT, p. 22-23].

> MS. LEAHY: "At a subsequent appointment, the defendant approached Person 4 in the waiting area. The defendant led Person 4 into a room where the acupuncturist was seated. The defendant directed Person 4 to sign here and I'll let you go. I examined you, he said.

> Person 4 signed paperwork as directed by the defendant, indicating that he had acupuncture treatment, when in fact, as the defendant knew, Person 4 did not undergo acupuncture. The defendant said he asked Person 4 to sign the fraudulent billing paperwork because the acupuncturist needed to make money. Again demonstrating his consciousness of guilt, the defendant …whispered to Person 4, don't get me thrown in jail. Jews don't do well in prison."

[GPT, p. 26-17].

Berkowitz affirmed that the facts recited by the government, including statements directly attributable to him, were accurate:

> THE COURT: Thank you. Mr. Berkowitz, did Ms. Leahy accurately describe what you did here?
> THE DEFENDANT: Yes, she did.

      THE COURT: Did she get anything wrong?

      THE DEFENDANT: No, she did not.

      THE COURT: Is there anything at all she said that you want to correct?

      THE DEFENDANT: No, I do not.

      THE COURT: You understand you're admitting to these facts and pleading guilty here today?

      THE DEFENDANT: Yes.

      THE COURT: Are you pleading guilty to 19 counts of healthcare fraud because you're in fact guilty of committing those crimes?

      THE DEFENDANT: Yes, I am.

      THE COURT: And are you pleading guilty to 23 counts of distribution of Schedule II and IV controlled substances outside the usual course of professional practice and without a legitimate medical purpose because you're in fact guilty of committing those crimes?

      THE DEFENDANT: Yes, I am.

[GPT, p. 28-29].

In addition to the other evidence against him, former employees – Thomas Fossile (Crim. No. 20-59), Olga Selcova (Crim. No. 20-02), and Sunje Pearlman (Crim. No. 20-03) – have been charged and admitted their conduct in furtherance of Berkowitz's scheme. These codefendants signed cooperation plea agreements with the government, and have provided detailed information incriminating Berkowitz.

Notwithstanding the overwhelming evidence of his guilt, Berkowitz argues that he is legally innocent. Legal innocence contemplates a defendant who has a complete affirmative defense, such as self-defense or entrapment, is not legally culpable. *See, e.g.*, *United States v. Scott*, 437 U.S. 82, 98, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) (stating that a finding of entrapment "necessarily establish[es] the criminal defendant's lack of criminal culpability") (citation omitted); *New Orleans & N.E.R. Co. v. Jopes*, 142 U.S. 18, 24, 12 S.Ct. 109, 35 L.Ed. 919 (1891) ("If the injury was done by the defendant in justifiable self-defense, he can n[ot] be punished criminally.... Because the act was lawful, he is wholly relieved from responsibility for

10

its consequences."). Likewise, a juvenile may be shielded from criminal liability because of his status as a juvenile. *See* 21 U.S.C. § 861(a) (making it unlawful only "for any person at least eighteen years of age to knowingly and intentionally - - employ ... a person under eighteen years of age" in drug operations); *see also, e.g.*, Wash. Rev. Code § 9A.04.050 ("Children under the age of eight years are incapable of committing crime."). If a defendant is not legally culpable, it stands to reason that he should be able to withdraw his guilty plea before sentencing because he is exempt from any punishment for the alleged acts constituting the crime, regardless of whether he committed them.

However, "the mere assertion of a legal defense is insufficient; the defendant must present a *credible* claim of legal innocence." *United States v. Hamilton*, 510 F.3d 1209, 1214 (10th Cir. 2007); *see also United States v. Thompson-Riviere*, 561 F.3d 345, 353 (4th Cir. 2009) (noting that the defendant's burden "is to credibly assert his legal innocence: that is, to present evidence that (1) has the 'quality or power of inspiring belief,' and (2) tends to 'defeat the elements in the government's *prima facie* case' or to 'make out a successful affirmative defense'" (citations omitted)).

Berkowitz has not presented a credible, or cognizable, claim of innocence. He merely asserts that he will raise a defense, which according to the evidence would easily be defeated. The only evidence he offers is a signed affidavit asserting that his attorney instructed him to lie to the Court; his attorney refused to attempt to separate the fraud and drug charges; as the owner of the business and never received or issued checks; the fraud amounted to 25% of revenues; he was the victim of identity theft; and he never referred to prescriptions as "goodie bags." The proffered evidence falls far below the threshold requirement to withdraw a guilty plea that was

11

accepted by the district court.

      **b.**      **Insufficient Reasons to Withdraw Guilty Plea.**

      Berkowitz has not provided fair and just reasons to withdraw his plea. He argues that he should be allowed to withdraw his plea because he was coerced and that his counsel was ineffective. The record does not support these claims.

      According to Berkowitz, the government "extorted" his plea by threatening that if he "did not take the deal by time certain" that the government would "superindict (sic) for 3rd degree murder." [3] [Def. Mtn., p. 9-10]. However, at the plea hearing, the defendant assured the Court, under oath, that his plea was voluntary and without any inducement:

> THE COURT: Since you're now sworn and under oath, you understand that the answers you give to my questions will be subject to penalties of perjury or making a false statement if you do not tell the truth?
> THE DEFENDANT: I understand.

[GPT, p. 3].

> THE COURT: Has anyone made any promise or assurance of any kind to you that is not in the guilty plea agreement in an effort to persuade or induce you to accept the agreement or plead guilty in this case?
> THE DEFENDANT: No, Your Honor.
> THE COURT: Has anyone threatened you in any way in an effort to persuade or induce you to accept this agreement or plead guilty in this case?
> THE DEFENDANT: No, Your Honor.

[GPT, p. 16].

Further, evidence about the death of Berkowitz's patient, who was Person 2 in the indictment, was fully disclosed in Footnote 7 of the Government's Guilty Plea Memorandum, which the defendant had in front of him at the plea hearing [GPT, p.17]. The footnote stated:

      "Person 2's last appointment with Berkowitz was on August 30, 2016 at which time

---

[3] There is no federal charge of 3rd degree murder.

> Berkowitz dispensed Schedule IV controlled substances and also gave Person 2 a prescription for 46 pills of Oxycodone (10 mg). Person 2 died on September 4, 2016. The City of Philadelphia Medical Examiner listed Drug Intoxication as the cause of death. At the time of death, Person 2 was obtaining prescriptions for Oxycodone from another physician in addition to Berkowitz."

This made it abundantly clear that Berkowitz was not the sole physician supplying Person 2 with oxycodone. The disclosure was made so the Court would be fully informed, before accepting Berkowitz's plea to charges that he illegally distributed controlled substances to Person 2, that there was insufficient evidence to charge him with Person 2's death.

Finally, Berkowitz is a highly educated man who retained a prominent defense attorney to counsel him. The notion that he was victim of coercion is patently absurd. Berkowitz agreed to the terms of the plea agreement because he received a benefit. Under the terms of the agreement, Berkowitz would be excused from paying forfeiture of approximately $3.4 million if he satisfied other financial penalties prior to sentencing. Berkowitz signed the negotiated plea agreement, and agreed to plead guilty, because it was in his interest to do so.

Berkowitz also argues that his counsel was ineffective for refusing to sever the drug charges from the health care fraud charges. And, he alleges that counsel directed him to lie to the Court and extorted him for extra fees. [Def. Mtn., p. 5]. A "court will permit a defendant to withdraw a guilty plea based on ineffective assistance of counsel only if (1) the defendant shows that his attorney's advice was under all the circumstances unreasonable under prevailing professional norms; and (2) the defendant shows that he suffered 'sufficient prejudice' from his counsel's errors." *Jones, 336* F.3d at 253-54 (citations omitted). Berkowitz has not supported either prong.

Counsel was wise to negotiate a plea agreement in light of the overwhelming evidence

against Berkowitz, and the enormity of the potential financial penalties he faced for his conduct. Moreover, Berkowitz misunderstands the joinder of charges. Fed. R. Crim. P. 8(a) authorizes an indictment or information to "charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." That was precisely the case here, with an indictment that charged Berkowitz with conditioning the receipt of opioid prescriptions on the patients' receipt (and abuse of their insurance) for drugs he dispensed on-site. In other words, the healthcare fraud charges and the drug diversion charges against the defendant were all part of the "common scheme or plan" and were appropriately joined.

Berkowitz's argument that his counsel was ineffective for failing to file a motion to sever faces even greater hurdles. The *Strickland* standard for an ineffective assistance claim requires the defendant to show that his counsel's performance was deficient, and that the deficient performance resulted in prejudice to the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to the second prong of the test, "a petitioner must demonstrate that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *United States v. Johnson*, No. CRIM. 08-285, 2014 WL 3953153, at 3 (W.D. Pa. Aug. 12, 2014) (citing *Strickland*, 466 U.S. at 694).

The discussion above fully illustrates why the defendant cannot satisfy the first prong on an ineffectiveness claim—because such a motion would have been wholly inappropriate. On the second prong, the defendant "must show that he likely would have prevailed on a motion to sever *and* that, having prevailed, there is a reasonable probability that he would not have been

14

convicted." *Johnson*, 2014 WL 3953153, at 4. For the reasons discussed above, a motion to sever would have failed, given the common scheme charged in the indictment. More importantly, the defendant "can show no prejudice because there was more than ample evidence of defendant's guilt." *Id.* at 5. A motion to sever would have had no impact on a finding of the defendant's guilt, since the defendant himself admitted his guilt in a very thorough change of plea hearing. Because any motion to sever would have been wholly inappropriate, and because not filing such a motion did not "deprive the defendant of a fair trial," *Strickland*, 466 U.S. at 687, the defendant's argument once again must fail.

Berkowitz's accusation that counsel instructed him to lie to the Court about the circumstances under which counsel was retained is equally unavailing and directly contradicted by the record:

> THE COURT: Has anyone instructed you to respond untruthfully to my questions?
> THE DEFENDANT: No, they haven't, Your Honor.

[GPT, p. 4].

In any event, Berkowitz's fee arrangement is wholly irrelevant to the issue of whether counsel's advice was under all the circumstances unreasonable under prevailing professional norms. Moreover, Berkowitz, under oath, assured the Court that he was satisfied with his attorney:

> THE COURT: You have an attorney, Mr. Neff. Correct?
> THE DEFENDANT: Yes.
> THE COURT: Have you had ample opportunity to discuss your case with Mr. Neff?
> THE DEFENDANT: Yes.
> THE COURT: And are you satisfied with Mr. Neff's representation of you?
> THE DEFENDANT: Yes.

[GPT, p. 12].

Likewise, in paragraph 20 of the written plea agreement, Berkowitz acknowledged that he was "satisfied with the legal representation provided by the defendant's lawyer; the defendant and

15

this lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that he is guilty."

Berkowitz has not made any showing that his attorney's advice was unreasonable under prevailing professional norms. To the contrary, he assured the Court under oath, and affirmed in a written plea agreement, that he was satisfied with his counsel's representation. Counsel's effectiveness is further evidenced by the favorable terms in the negotiated plea agreement under which the defendant could avoid criminal forfeiture of approximately $3.4 million.

c.     **Prejudice to the Government.**

The government need not make any showing of prejudice unless and until the defendant meets his burden on the first two factors. *Martinez*, 785 F.2d at 113. Because Berkowitz has failed to satisfy the first two factors, the government need not show any prejudice from the withdrawal of his plea. Nonetheless, the government would certainly be prejudiced if the defendant is permitted to withdraw his plea. If the defendant's motion is granted, the government will undergo "the expense, difficulty, and risks of trying a defendant" who has already admitted his guilt and been adjudged guilty." *Id.*

IV.     **Recusal Not Warranted.**

The defendant argues that the Court should be recused pursuant to 28 U.S.C. § 144. According to Berkowitz, "Judge Diamond was "mislead" by false statements in the press, and he now has "pre-formed opinions" that he is a drug-dealer because the indictment referred to the bags of medically unnecessary prescription drugs he distributed as "goodie bags."" [Def. Mtn., p. 8].

Section 144 provides for recusal, stating: "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding." A claim of bias must be "evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994) (emphasis in original); *Massachusetts School of Law v. American Bar Association*, 107 F. 3d 1026, 1042 (3d Cir. 1997) ("standard for recusal is whether an objective observer reasonably might question the judge's impartiality."); *see also United States v. Antar*, 53 F.3d 568, 574 (3d Cir. 1995); *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 167 (3d Cir. 1993); *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 98 (3d Cir. 1992).

While recusal under 28 U.S.C. § 144, requires the filing of an affidavit, the mere filing of an affidavit does not automatically disqualify a judge. *United States v. Townsend,* 478 F.2d 1072, 1073 (3d Cir. 1973). *See also Behr v. Mine Safety Appliances Co., 233 F.2d 371* (C.A.3), cert. denied, 352 U.S. 942, 1 L. Ed. 2d 237, 77 S. Ct. 264 (1956). Disqualification results only from the filing of a timely and sufficient affidavit. *Brotherhood of Locomotive Firemen and Enginemen v. Bangor and Aroostook R. Co.*, 127 U.S. App. D.C. 23, 380 F.2d 570, *cert. denied per curiam*, 389 U.S. 327, 88 S. Ct. 437, 19 L. Ed. 2d 560 (1967).

Berkowitz has not filed the required affidavit. Even if he did, it would be untimely. To be timely under § 144, an affidavit must be filed as soon as the litigant learns of the events in question. *See Bumpus v. Uniroyal Tire Co.*, 385 F.Supp. 71 (E.D. Pa. 1974) (rejecting affidavit as untimely where facts that gave rise in the affidavit occurred between two weeks and two

months prior to the filing of the motion). Berkowitz alleges bias displayed at the plea hearing on January 24, 2020, which was about six months ago. In the meantime, he repeatedly sought release from custody which the Court denied. As explained by the Third Circuit, "[t]he judicial process can hardly tolerate the practice of a litigant with knowledge of circumstances suggesting possible bias holding back, while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming." *Smith v. Danyo*, 585 F.2d 83, 86 (3d Cir. 1976). This is precisely the situation here. As the record shows clearly, Berkowitz's allegations are frivolous.

This Court has every reason to rely on the sworn statements of a defendant at his guilty plea hearing. Such solemn admissions under oath should never be set aside simply because a defendant later regrets the natural consequences of his actions.

WHEREFORE, the government respectfully submits that Berkowitz's motion to withdraw his guilty plea be denied in its entirety.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney


 _s/ M. Beth Leahy_
M. BETH LEAHY
ANTHONY D. SCICCHITANO
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I certify that on this day this pleading was electronically filed, and thus served on

defense counsel:

Marc Neff, Esq.
Neff & Sedacca
1845 Walnut Street
13th Floor
Philadelphia, PA 19103


I certify that on this day this pleading was sent by first-call mail, postage prepaid, to

defendant:


Andrew M. Berkowitz
FDC (77307-066)


*s/ M. Beth Leahy*
M. Beth Leahy
Assistant United States Attorney

Date: July 23, 2020

EXHIBIT A

```
1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                              -  -  -

3      UNITED STATES OF AMERICA      :  CRIMINAL ACTION NO.
                                     :  2:19-cr-00356
4         v.                         :
                                     :
5      ANDREW M. BERKOWITZ           :  CHANGE OF PLEA
       _____

6

7                                      James A. Byrne U.S. Courthouse
                                       601 Market Street
8                                      Philadelphia, PA 19106
                                       January 24, 2020
9                                      Commencing at 9:40 a.m.

10     _____

                     BEFORE THE HONORABLE PAUL S. DIAMOND
11

12     _____

13     APPEARANCES:

14            U.S. ATTORNEY'S OFFICE
              BY:  MARY BEATH LEAHY, ESQUIRE
15            BY:  ANTHONY D. SCICCHITANO, ESQUIRE
              One Independence Mall - Suite 1250
16            615 Chestnut Street
              Philadelphia, Pennsylvania 19106
17            (215) 861-8343
              mary.beth.leahy@usdoj.gov
18            anthony.scicchitano@usdoj.gov
              Representing the United States of America
19

20                             -  -  -

21
                     Ann Marie Mitchell, CRR, RDR, RMR
22                        Official Court Reporter
                             (267) 299-7250
23

24     Proceedings taken stenographically and prepared utilizing
       computer-aided transcription
25
```

```
1    APPEARANCES CONTINUED:

2

          NEFF & SEDACCA PC
3         BY:  MARK NEFF, ESQUIRE
          1845 Walnut Street
4         Suite 1300
          Philadelphia, Pennsylvania 19103
5         (215) 563-9800
          marc@neffsedacca.com
6         Representing the Defendant

7

8

9

10                              -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Court called to order at 9:40 a.m.)

2              THE COURT:  Good morning, everybody.  Please be

3    seated.

4              RESPONSE:  Good morning, Your Honor.

5              THE COURT:  The purpose of the proceeding today is for

6    the defendant to enter a guilty plea in this matter.

7              Could the defendant please rise and could the clerk

8    please swear the defendant.

9              ANDREW M. BERKOWITZ, DEFENDANT, was duly sworn.

10             THE DEPUTY CLERK:  Please state your full name for the

11   record.

12             THE DEFENDANT:  Andrew Mark Berkowitz.

13             THE DEPUTY CLERK:  Thank you.

14             THE COURT:  Please be seated, Mr. Berkowitz.

15             Do you understand that during these proceedings I will

16   ask you questions and I assume the answers you give to my

17   questions will be truthful.  Correct?

18             THE DEFENDANT:  I understand.

19             THE COURT:  Since you're now sworn and under oath, you

20   understand that the answers you give to my questions will be

21   subject to penalties of perjury or making a false statement if

22   you do not tell the truth?

23             THE DEFENDANT:  I understand.

24             THE COURT:  If you could move the microphone a little

25   closer, it would be helpful.

1          You also understand that I'll ask you questions to

2   satisfy myself that you are competent and able to enter a plea

3   and to satisfy myself that you are knowingly and voluntarily

4   giving up your rights in entering this plea?

5          THE DEFENDANT:  I understand.

6          THE COURT:  If you plead guilty, do you also

7   understand that I will ask you questions about what you did to

8   satisfy myself that you're guilty as charged?

9          THE DEFENDANT:  I understand.

10          THE COURT:  If at any time you don't understand

11   anything at all, you'll let me know immediately.  Okay?

12          THE DEFENDANT:   Thank you.

13          THE COURT:  And if you want to speak with your lawyer,

14   you let me know.  We'll take an immediate recess so you can

15   speak privately with Mr. Neff for as long as necessary.  Clear?

16          THE DEFENDANT:  I appreciate that.

17          THE COURT:  Has anyone instructed you to respond

18   untruthfully to my questions?

19          THE DEFENDANT:  No, they haven't, Your Honor.

20          THE COURT:  What's your full name?

21          THE DEFENDANT:  Andrew Mark Berkowitz.

22          THE COURT:  How old are you?

23          THE DEFENDANT:  60.

24          THE COURT:  And how far did you go in school?  How far

25   did you go in school?

1           THE DEFENDANT:  I finished medical school.

2           THE COURT:  Where was that?

3           THE DEFENDANT:  Medical College of Pennsylvania.

4           THE COURT:  And could you briefly describe your most

5     recent employment.

6           THE DEFENDANT:  I've been self-employed for the last

7     eight years doing pain management.

8           THE COURT:  As a physician?

9           THE DEFENDANT:  That is correct.

10          THE COURT:  Have you taken any drugs, medicine or

11    pills in the last 24 hours?

12          THE DEFENDANT:  Medications prescribed to me, yes.

13          THE COURT:  And what medications are those?

14          THE DEFENDANT:  I take valsartan, a blood pressure

15    pill.  I take Norvasc, a blood pressure pill.  I take Requip,

16    which is for restless leg.  I take aspirin for cardio -- cardio

17    protection.  I take Motrin occasionally.

18          THE COURT:  Motrin?

19          THE DEFENDANT:  Yes.

20          THE COURT:  For pain?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Does any drug -- any of the drugs you're

23    taking, do any of these drugs affect your ability to read or

24    write?

25          THE DEFENDANT:  No, they do not.

1            THE COURT:  Do they affect your ability to speak or to

2    understand what's being said to you?

3            THE DEFENDANT:  No, they do not.

4            THE COURT:  Have you drunk any alcoholic beverages in

5    the last 24 hours?

6            THE DEFENDANT:  No, I haven't.

7            THE COURT:  Have you ever been hospitalized or treated

8    for mental illness or drug addiction?

9            THE DEFENDANT:  No.

10            THE COURT:  Are you currently or have you recently

11    been under the care of a physician, psychiatrist, psychologist

12    or social worker, the physician for the medications you've

13    described, correct, or are you prescribing them for yourself?

14            THE DEFENDANT:  No, I don't prescribe for myself.  I

15    forgot one thing.

16            I've been on an antidepressant for the last couple

17    months which I'm coming off this month.

18            THE COURT:  What antidepressant is that?

19            THE DEFENDANT:  Lexapro.

20            THE COURT:  And who prescribed that to you?

21            THE DEFENDANT:  One of my doctors, my sleep apnea

22    doctor.

23            THE COURT:  Are you being treated by a psychiatrist,

24    psychologist, social worker, or have you been so treated for

25    the last year or two?

1          THE DEFENDANT:  For the last what?

2          THE COURT:  Year or two.

3          THE DEFENDANT:  Yes.  About two years ago I was seeing

4   a psychologist.  I think I stopped about two years, maybe a

5   little bit before then.

6          THE COURT:  I'm sorry, I can't understand what you're

7   saying.  Move the microphone a little closer.

8          THE DEFENDANT:  I'm not sure if it's been within that

9   two years.  It might not have been.  It might have been before

10  that.

11         THE COURT:  Let's start again.

12         How many doctors are currently treating you?

13         THE DEFENDANT:  About five.

14         THE COURT:  Five doctors?

15         THE DEFENDANT:  Yes.

16         THE COURT:  And is any doctor in that group a

17  psychiatrist?

18         THE DEFENDANT:  No.  No, they're not.

19         THE COURT:  They're all for blood pressure, restless

20  leg --

21         THE DEFENDANT:  Yes, that's correct.

22         THE COURT:  -- pain.  Anything else?

23         THE DEFENDANT:  No.  Blood pressure.

24         THE COURT:  And you're also taking Lexapro?

25         THE DEFENDANT:  Yeah.  That is correct.

1          THE COURT:  And which of your doctors is prescribing

2  that?

3          THE DEFENDANT:  The sleep apnea doctor.

4          THE COURT:  And who is that?

5          THE DEFENDANT:  Dr. Lee.

6          THE COURT:  Dr. Lee?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And so your sleep apnea doctor is

9  prescribing an antidepressant?

10          THE DEFENDANT:  For this -- yeah, because I'm just --

11          THE COURT:  I'm not asking you because.  I just want

12  you to answer my question.

13          THE DEFENDANT:  That is correct.  That is correct.

14          THE COURT:  What dosage of Lexapro?

15          THE DEFENDANT:  I believe it's 10 milligrams.

16          THE COURT:  10 milligrams.  And how often do you take

17  it?

18          THE DEFENDANT:  Once a day.

19          THE COURT:  And you've been taking it for how long?

20          THE DEFENDANT:  About three months.

21          THE COURT:  And is this for anxiety?

22          THE DEFENDANT:  No.  It's for situational depression.

23          THE COURT:  Situational depression.  Has it helped at

24  all?

25          THE DEFENDANT:  I'm not sure.  I'm doing better.

1          THE COURT:  And you say you're going to go off it this

2   month?

3          THE DEFENDANT:  Yes.  That's my plan.

4          THE COURT:  But you haven't gone off it yet?

5          THE DEFENDANT:  No.  I probably have about two more

6   weeks.

7          THE COURT:  Does the Lexapro have any effect on you at

8   all other than helping a bit with the depression?

9          THE DEFENDANT:  No, it does not.

10          THE COURT:  Why don't you name the other doctors who

11   are treating you and what they're treating you for.

12          THE DEFENDANT:  If it's okay, I have a list.

13          THE COURT:  That's fine.

14          THE DEFENDANT:  I have -- do you want the whole list?

15   I have Dr. Frankil, Craig Frankil, who is treating me for

16   paroxysmal atrial fibrillation and hypertension.

17          THE COURT:  The valsartan is for hypertension.

18          And what are you taking for the atrial fibrillation,

19   the blood thinner?

20          THE DEFENDANT:  Just baby aspirin.

21          THE COURT:  Just baby aspirin.  Okay.

22          THE DEFENDANT:  Okay.  And I just said the sleep apnea

23   and hypoxia was Dr. Howard Lee.  I use a CPAP mask.  And that's

24   also restless leg.

25          And I have a regular doctor, the name is Dr. William

1   Bernstein.  And he's treated me for osteoarthritis, relatively

2   minor illnesses, family practice.

3            THE COURT:  So that's three doctors.

4            THE DEFENDANT:  Those are the main doctors.  I mean,

5   I've seen --

6            THE COURT:  I'm sorry, I just want you to answer my

7   questions.

8            I want you to name ever doctor who is treating you and

9   what he or she is treating you for.

10            THE DEFENDANT:  Okay.  No problem.

11            Dr. William Bernstein and Dr. George Stollsteimer are

12   treating me for bilateral cervical radicular syndrome.

13            THE COURT:  What is that?  I'm sorry, I'm not a

14   doctor.

15            THE DEFENDANT:  That's okay.  It's a compressed nerve.

16   It's a pinched nerve.

17            THE COURT:  Okay, okay.

18            THE DEFENDANT:  My bad.  Osteo -- Dr. George

19   Stollsteimer is treating me for osteoarthritis of the knees,

20   okay, mostly.

21            And I have psoriasis, which Dr. David Enis is treating

22   me for.  He's a dermatologist.

23            THE COURT:  Any prescription medications for that?

24            THE DEFENDANT:  Yeah.  I get one of those shots every

25   two months.

1          THE COURT:  What shot is that?

2          THE DEFENDANT:  It's Tremfya.

3          THE COURT:  Okay.  Does it have any effect on you

4    other than helping you with your psoriasis?

5          THE DEFENDANT:  I don't -- no, no.  It doesn't have

6    any effect on my sensory, my ability to mentate, my emotional.

7          THE COURT:  Okay.  Go on.

8          THE DEFENDANT:  And I have hearing loss, mild hearing

9    loss from Dr. Rafe Gabon (ph).

10          THE COURT:  Your mild hearing loss, is it being

11    treated at all?

12          THE DEFENDANT:  No, no.  It's been stable for 10, 15

13    years.

14          THE COURT:  Okay.

15          THE DEFENDANT:  And that's basically it.

16          THE COURT:  Not basically it, is that it?

17          THE DEFENDANT:  Yeah, that's it.

18          THE COURT:  Okay.  So if I ask you if you have any

19    difficulty hearing, your answer would be you have some mild

20    hearing loss?

21          THE DEFENDANT:  Yes, that is correct.  But I hear you

22    clearly.

23          THE COURT:  Okay.  If you don't hear anything at all,

24    just let me know immediately.

25          THE DEFENDANT:  Thank you.

1          THE COURT:  Physically how are you feeling right now?

2          THE DEFENDANT:  Relatively okay.

3          THE COURT:  I don't know what that means.

4          THE DEFENDANT:  I don't feel ill.  I feel well.

5          THE COURT:  Do you understand that you have the right

6   to be represented by an attorney at every stage of the

7   proceedings against you?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And do you understand that if you cannot

10  afford the services of an attorney to try your case or to

11  appeal your case, the Court will appoint one to represent you?

12         THE DEFENDANT:  Yes.

13         THE COURT:  You have an attorney, Mr. Neff.  Correct?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Have you had ample opportunity to discuss

16  your case with Mr. Neff?

17         THE DEFENDANT:  Yes.

18         THE COURT:  And are you satisfied with Mr. Neff's

19  representation of you?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Have you received a copy of the indictment

22  in this case, that is, the written charges made against you by

23  the grand jury?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Do you understand that in summary, the

1  following charges have been brought against you in the

2  indictment:  Counts 1 through 19, each count charging you with

3  healthcare fraud; Counts 20 through 42, each charging you with

4  distribution of Schedule II and Schedule IV controlled

5  substances outside the usual course of professional practice

6  and without a legitimate medical purpose?  You understand those

7  42 charges have been brought against you?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Ms. Leahy, is there a plea agreement in

10  this case?

11         MS. LEAHY:  Yes, Your Honor, there is.

12         THE COURT:  Will you please state the terms and

13  stipulations of the plea agreement.

14         MS. LEAHY:  Yes, Your Honor.  Under the terms of the

15  plea agreement, the defendant has agreed to plead guilty to 19

16  counts of healthcare fraud in violation of Title 18 United

17  States Code Section 1347 and 23 counts of distribution of

18  controlled substances, Schedule II and IV, in violation of

19  Title 21 United States Code Section 841(a)(1).  The

20  defendant -- for distributing controlled substances outside the

21  course of professional practice and without a legitimate

22  medical purpose.

23         The defendant has also agreed to pay financial

24  penalties prior to sentencing of approximately $6.3 million.

25  That includes about $3-and-a-half million of restitution and

1   $2.8 million of civil penalties.

2          Per the terms of the plea agreement, if those

3   financial penalties are not paid prior to sentencing, the

4   defendant agrees not to contest forfeiture of approximately

5   $3.4 million, which the government will pursue.

6          The defendant has also agreed to waive appellate

7   rights and rights to collaterally attack his conviction and

8   sentence with limited exceptions, and they are --

9          THE COURT:  Which I will review with the defendant.

10         MS. LEAHY:  Okay.  Thank you, sir.  And those are

11  specified on page 16 and 17 of the plea agreement.

12         THE COURT:  Are there any stipulations?

13         MS. LEAHY:  Yes.  There are factual stipulations that

14  the parties have entered into.

15         If I can just find my page.

16         There are stipulations.  The base offense level for

17  healthcare fraud is 6.  There is a stipulation to the amount of

18  loss for the healthcare fraud, which is approximately

19  $9,376,214.  There is a stipulation that the defendant abused a

20  position of public or private trust.  There is a stipulation

21  for the marijuana equivalent of Counts 20 to 42, which is at

22  least 100 kilograms but less than 400 kilograms.  And there is

23  a stipulation that as of the date of this agreement, the

24  defendant has demonstrated acceptance of responsibility, and he

25  has also notified the government on a timely basis to avoid the

1  government preparing for trial.  And he would receive another

2  downward level adjustment for that.

3            THE COURT:  Could I please see the executed guilty

4  plea agreement.

5            MR. NEFF:  May I approach, Your Honor?

6            THE COURT:  Sure.

7            Mr. Neff, are these the terms and stipulations of the

8  guilty plea agreement?

9            MR. NEFF:  Yes, Your Honor.

10           THE COURT:  Mr. Berkowitz, have you had a chance to

11  review every word of the guilty plea agreement with Mr. Neff?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Did he answer all your questions in

14  connection with the agreement?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  You feel you understand it pretty well; is

17  that right?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  And are the terms and the stipulations in

20  the agreement as summarized by Ms. Leahy a moment ago the terms

21  and stipulations as you best understand them?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  Do you understand that the sentence I

24  impose on you may be affected by the stipulations that you and

25  the government have entered into and that Ms. Leahy just

1  described?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Has anyone made any promise or assurance

4  of any kind to you that is not in the guilty plea agreement in

5  an effort to persuade or induce you to accept the agreement or

6  plead guilty in this case?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  Has anyone threatened you in any way in an

9  effort to persuade or induce you to accept this agreement or

10 plead guilty in this case?

11         THE DEFENDANT:  No, Your Honor.

12         THE COURT:  You've signed the plea agreement; is that

13 right, Mr. Berkowitz?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  This is your signature?

16         THE DEFENDANT:  Yes.

17         THE COURT:  You signed it in November of last year; is

18 that right?

19         THE DEFENDANT:  That is correct.

20         THE COURT:  Did you also review with Mr. Neff the

21 three-page acknowledgment of rights form that follows the

22 guilty plea agreement?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Did Mr. Neff answer all your questions in

25 connection with that agreement?

1                THE DEFENDANT:  Yes, Your Honor.

2                THE COURT:  And you feel you understand that pretty

3  well also?

4                THE DEFENDANT:  Yes, Your Honor.

5                THE COURT:  And you signed it on the same day you

6  signed the guilty plea agreement.  Correct?

7                THE DEFENDANT:  Yes, Your Honor.

8                THE COURT:  Mr. Berkowitz, Ms. Leahy is going to

9  describe the factual basis of this guilty plea and criminal

10  proceeding.  That means she's going to set out what the

11  government alleges that you did here.

12                And when she's done, I'm going to ask you whether you

13  did what Ms. Leahy says you did.  I anticipate she is going to

14  read pages 4, 5, 6, 7, 8, 9 and 10 of the government's guilty

15  plea memorandum.  And I would ask you to listen and to read

16  along.  And if she gets anything wrong, if there's anything at

17  all she says you want to correct or supplement, I will ask you

18  to do so when she's done.

19                Ms. Leahy.

20                MS. LEAHY:  Your Honor, if this case were to proceed

21  to trial, the United States would prove beyond a reasonable

22  doubt, facts including, but not limited to the following.

23                The defendant was a medical doctor licensed in

24  Pennsylvania and registered with the Drug Enforcement

25  Administration.  As such, he was permitted to prescribe

1  controlled substances within the usual course of professional

2  practice for a legitimate medical purpose.  The defendant

3  operated a medical practice under the name A+ Pain Management,

4  which was located on Haldeman Avenue in Philadelphia,

5  Pennsylvania.

6        At A+ the defendant dispensed generic prescription

7  drugs, including Schedule IV controlled substances, for which

8  he submitted claims to patients' medical insurance providers.

9  Medical insurance covered only those medications that were

10 prescribed for a medically accepted indication and that were

11 medically necessary for the patient.

12       The defendant stocked wholesale quantities of

13 inexpensive generic brands of prescription drugs, such topical

14 analgesics, muscle relaxers, anti-inflammatories and Schedule

15 IV controlled substances indicated for pain, anxiety and

16 insomnia, which he billed to insurance providers at a

17 significant markup.

18       The defendant dispensed multiple prescription drugs to

19 every -- virtually every patient whose insurance would cover

20 the drugs he had in stock.  The defendant dispensed these drugs

21 for profit without any meaningful assessment of the medical

22 necessity or whether the drugs had a legitimate medical

23 purpose.

24       The drugs that the defendant dispensed to each patient

25 usually included a combination of several drugs, such as

1   topical analgesics, muscle relaxers, anti-inflammatories and

2   the Schedule IV controlled substances which are charged in the

3   indictment, such as tramadol, eszopiclone and quazepam.  For

4   each bag of prescription drugs that the defendant dispensed,

5   the defendant submitted claims for reimbursement falsely

6   asserting that the drugs were medically necessary for the

7   patient.

8           THE COURT:  And as stated here, the defendant referred

9   to these bags of prescription controlled and noncontrolled

10  prescription drugs as goodie bags?

11          MS. LEAHY:  The office staff referred to them.

12          THE COURT:  Called them goodie bags?

13          MS. LEAHY:  Yes.

14          THE COURT:  Okay.

15          MS. LEAHY:  The defendant also prescribed oxycodone,

16  which is a Schedule II controlled substance, to pill-seeking

17  patients in exchange for submitting excessive claims to the

18  patient's insurance for his medically unnecessary prescription

19  drugs and for services not rendered.

20          Referring to oxycodone, the defendant would tell

21  patients, you're not getting your medication if you don't take

22  the bag of prescription drugs that he had prescribed.

23          The FBI began investigating fraud complaints again the

24  defendant by Independence Blue Cross.  For example, an IBC

25  member who is identified as Person 1 in the indictment would

1    testify at trial that he or she --

2             THE COURT:  Hold on just a second.

3             Mr. Neff, do you and your client know who Person 1 is?

4             MR. NEFF:  Yes, Your Honor, I believe we do.

5             THE COURT:  Okay.  Go on.

6             MS. LEAHY:  That person would testify that he or she

7    sought treatment with the defendant on or about July 2, 2015

8    for a minor back injury.

9             Person 1 reported that the defendant did not take any

10   medical history, perform a physical examination or render any

11   type of medical care.  Nevertheless, the defendant gave Person

12   1 a tote bag of prescription medications.  The defendant told

13   Person 1 to go home and try these despite Person 1's repeated

14   attempts to refuse the medications.

15            In the bag were RelyyT patches, Celecoxib,

16   cyclobenzaprine, tramadol and quazepam, which are both Schedule

17   IV controlled substances.

18            The drugs were dispensed to Person 1 without any

19   information or counseling, and the defendant billed IBC

20   approximately $11,259 for the medications in the tote bag for

21   which IBC paid approximately $4,338.

22            Another IBC member who's identified as Person 2 in the

23   indictment became the defendant's --

24            THE COURT:  Hold on just a second.

25            Mr. Neff, do you and your client know who Person 2 is?

1          MR. NEFF:  Yes, Your Honor.

2          THE COURT:  Okay.  Go on.

3          MS. LEAHY:  Became the defendant's patient in or about

4    March 2015 after Person 2's physician refused to continue to

5    prescribe oxycodone.  Person 2 went to the defendant for the

6    express purpose of obtaining oxycodone prescriptions.

7          Person 2's medical records show that the defendant

8    dispensed various types of medications to Person 2, including

9    the RelyyT patches, Celebrex, cyclobenzaprine, quazepam and

10   tramadol on a monthly basis.

11         From in or about March 2015 through in or about August

12   2016, the defendant submitted claims to IBC totalling at least

13   approximately $141,329 for medically unnecessary prescription

14   drugs dispensed to Patient 2.

15         THE COURT:  Patient 2 is Person 2?

16         MS. LEAHY:  Person 2, I'm sorry, yes.  That's my

17   mistake.

18         THE COURT:  Okay.

19         MS. LEAHY:  In addition to the dispensed drugs, which

20   included two Schedule IV controlled substances, Person 2 also

21   obtained prescriptions from the defendant for oxycodone

22   10 milligrams, a Schedule II controlled substance, on a

23   biweekly basis.

24         Beginning in or around April 2017, two civilians were

25   recruited by the FBI who were identified in the indictment as

1  Person 3 and Person 4 to work undercover posing as pill-seeking

2  patients.

3          THE COURT:  Hold on just a second.

4          Mr. Neff, do you and your client know who Person 3 is

5  and who Person 4 is?

6          MR. NEFF:  Yes, sir.

7          THE COURT:  All right.  Go on.

8          MS. LEAHY:  Collectively Person 3 and Person 4

9  completed 17 appointments with the defendant.  Each appointment

10 was recorded on audio and videotape.

11         The government would introduce these recordings

12 showing that the defendant prescribed controlled substances

13 outside the usual course of professional practice and without a

14 legitimate medical purpose and submitted fraudulent claims to

15 healthcare benefit programs for medically unnecessary

16 prescription drugs and for medical services not rendered.

17         The recordings include --  and I'll summarize the

18 following.  For Person 3 --

19         THE COURT:  Don't summarize, just read.

20         MS. LEAHY:  Okay.

21         Person 3.  At Person 3's first appointment for which

22 Person 3 paid $185 cash, the defendant asked Person 3, what

23 kind of medication are you looking for.

24         The defendant offered to write a prescription but

25 cautioned, showing consciousness of guilt, the news has been

1   saying that I'm a glorified drug pusher.  They're saying it's

2   the biggest problem other than ISIS.  So the DEA is all over me

3   like white on rice.  And referring to himself, Jews do very

4   poorly in prison.

5         The defendant prescribed oxycodone 5 milligrams to

6   Person 3.  The defendant did not take a medical history or

7   evaluate Person 3's heart, lungs, blood pressure or body

8   functions or provide counseling about dosage levels,

9   instruction for use, frequency and duration of use and possible

10  side effects before prescribing the oxycodone.

11        At the second appointment, Person 3 presented IBC

12  insurance.  This time the defendant increased the amount of

13  oxycodone 5 milligrams he prescribed for Person 3.  He also

14  gave Person 3 a tote bag containing prescription drugs such as

15  Nalfon, tramadol and cyclobenzaprine for which he billed IBC

16  approximately $1,388.50.  As before, the defendant did not

17  render any medical care and did not discuss the medications

18  with Person 3, even as he dispensed tramadol, a Schedule IV

19  controlled substance, to take with the prescribed oxycodone.

20        At each subsequent appointment, Person 3 obtained a

21  prescription from the defendant for oxycodone 5 milligrams and

22  a bag of prescription drugs including both Tramazole (sic) and

23  eszopiclone.  The defendant billed IBC approximately $1,895.17

24  for each bag he dispensed.

25        Person 4.  At the initial appointment, Person 4 asked

1  for oxycodone.  Person 4 said that another doctor who had

2  abruptly closed had been prescribing 60 pills of oxycodone

3  30 milligrams to Person 4.

4           Showing his understanding that these prescriptions

5  were for diversion, the defendant responded, you know how much

6  that's worth on the street?  It's like 800 bucks.  So, you

7  know, you do that 13 times, you go to two doctors, go to two

8  doctors, that would be like $40,000.  The defendant favorably

9  noted that Person 4 had IBC insurance.  While he refused to

10 prescribe the same amount as Person 4's previous physician, the

11 defendant agreed, quote/unquote, to do three a day of 10s,

12 which referred to oxycodone 10 milligram pills.

13          The defendant instructed Person 4 to go to the

14 chiropractor who worked for him upstairs at A+.  The defendant

15 said it was important to paper the medical file with treatment

16 notes because the DEA was shutting people down.

17          The defendant also told Person 4 that he had a

18 pharmacy on site and would dispense a muscle relaxer and pain

19 patches with the oxycodone.

20          At that visit and subsequent visits, Person 4 obtained

21 prescriptions from the defendant for oxycodone 10 milligrams

22 and a tote bag containing two bottles of chlorzoxazone and four

23 boxes of lidocaine ointment for which the defendant billed IBC

24 more than $4,000 per bag.  The defendant provided no

25 consultation regarding any of the medications he prescribed.

1          As part of the undercover operation, Person 4 was

2    instructed to contact the defendant's practice to reschedule an

3    appointment purportedly due to a car accident.  The next day

4    the defendant personally called Person 4 from his cell phone

5    asking for the auto accident insurance claim number and the

6    name of Person 4's lawyer.  The defendant told Person 4 that A+

7    would handle any accident inquiries.

8          Travelers Insurance provided the FBI with a claim

9    number for the undercover operation.

10          At Person 4's next appointment after the purported

11    accident, the defendant did not inquire whether Person 4 had

12    any physical complaints as a result of the auto accident.  In

13    addition to the usual prescription drugs he dispensed to Person

14    4, the defendant gave Person 4 an electrical stimulation

15    machine without any justification or explanation for which he

16    billed Travelers approximately $2,000.

17          The defendant also insisted that Person 4 receive

18    acupuncture from a therapist who worked at A+ for which he

19    billed Travelers approximately $756.  The defendant also

20    insisted that Person 4 accepted what the defendant described as

21    a fancy heating pad for which he billed Travelers approximately

22    $4,000.

23          At the same time he was billing for additional

24    services and equipment for Person 4, the defendant agreed to

25    Person 4's request for an increased oxycodone prescription.

1          At a subsequent appointment, the defendant approached

2    Person 4 in the waiting area.   The defendant led Person 4 into

3    a room where the acupuncturist was seated.   The defendant

4    directed Person 4 to sign here and I'll let you go.   I examined

5    you, he said.

6          Person 4 signed paperwork as directed by the

7    defendant, indicating that he had acupuncture treatment, when

8    in fact, as the defendant knew, Person 4 did not undergo

9    acupuncture.   The defendant said he asked Person 4 to sign the

10   fraudulent billing paperwork because the acupuncturist needed

11   to make money.   Again demonstrating his consciousness of guilt,

12   the defendant leaned in and whispered to Person 4, don't throw

13   me in jail.   Jews --

14          THE COURT:   Read it accurately, please.

15          MS. LEAHY:   Yes.

16          Demonstrating his consciousness of guilt, the

17   defendant whispered to Person 4, don't throw me in jail --

18          THE COURT:   No, that's not what it says here.

19          MS. LEAHY:   Demonstrating his consciousness --

20          THE COURT:   It says, don't get me thrown in jail.

21          MS. LEAHY:   Oh, I'm so sorry.   I actually just had eye

22   surgery, so my reading maybe a little off.   I'm so sorry about

23   that.

24          THE COURT:   Go ahead.

25          MS. LEAHY:   Demonstrating his consciousness of guilty,

1    the defendant whispered to Person 4, don't get me thrown in

2    jail.  Jews don't do well in prison.

3         Former employees, who are cooperating with the

4    government, would testify that Defendant Berkowitz submitted

5    fraudulent claims to their health insurance for medically

6    unnecessary goodie bag drugs.  Employees were encouraged to

7    refer family and friends who had private insurance to obtain

8    goodie bags for which Berkowitz would bill healthcare insurers.

9    Berkowitz would pay employees a kickback of approximately

10   50 percent of the net proceeds he obtained on the fraudulent

11   claims he submitted for the employee and the employee's

12   referrals.

13        In addition, a case agent would introduce claims for

14   Medicare, IBC, Aetna and CVS Caremark for prescription drugs

15   dispensed by Defendant Berkowitz.  The agent would testify that

16   from in or about January 2015 through in or about April 2019

17   Berkowitz submitted claims totaling approximately $9,376,214

18   for those prescription drugs --

19        THE COURT:  Please, please.  You didn't -- $9,376,214.

20        MS. LEAHY:  $9,376,214 for those prescription drugs

21   identified during the investigation as being dispensed by

22   Berkowitz to patients without any medical necessity.

23        Finally, Stephen Thomas, MD, an expert in pain

24   management medicine, would testify that Berkowitz failed to

25   adhere to the minimum standards for the prescription of

1   controlled substances.  Dr. Thomas would opine that the

2   prescriptions issued to Person 1, Person 2, Person 3 and Person

3   4 were outside the course of professional practice and without

4   a legitimate medical purpose.

5          The government respectfully submits that the

6   information summarized provides a factual basis for the

7   defendant's guilty plea.

8          THE COURT:  Thank you.

9          Mr. Berkowitz, did Ms. Leahy accurately describe what

10  you did here?

11         THE DEFENDANT:  Yes, she did.

12         THE COURT:  Did she get anything wrong?

13         THE DEFENDANT:  No, she did not.

14         THE COURT:  Is there anything at all she said that you

15  want to correct?

16         THE DEFENDANT:  No, I do not.

17         THE COURT:  You understand you're admitting to these

18  facts and pleading guilty here today?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Are you pleading guilty to 19 counts of

21  healthcare fraud because you're in fact guilty of committing

22  those crimes?

23         THE DEFENDANT:  Yes, I am.

24         THE COURT:  And are you pleading guilty to 23 counts

25  of distribution of Schedule II and IV controlled substances

1  outside the usual course of professional practice and without a

2  legitimate medical purpose because you're in fact guilty of

3  committing those crimes?

4          THE DEFENDANT:  Yes, I am.

5          THE COURT:  Do you understand that you have the right

6  to be tried by a jury or by a judge without a jury if you do

7  not plead guilty?

8          THE DEFENDANT:  Yes, I do.

9          THE COURT:  Do you understand that you through your

10 attorney could participate in the selection of a jury?

11         THE DEFENDANT:  Yes, I do.

12         THE COURT:  Do you understand that if you plead not

13 guilty, you have the right to be tried with the assistance of

14 counsel?

15         THE DEFENDANT:  Yes, I do.

16         THE COURT:  Do you understand that at trial you would

17 be presumed to be innocent?

18         THE DEFENDANT:  Yes, I do.

19         THE COURT:  Do you understand that the government

20 would be required to prove you guilty by competent evidence and

21 beyond a reasonable doubt before you could be found guilty at

22 trial?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Do you understand you would not have to

25 prove that you were innocent?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you understand in the course of trial,

3   witnesses for the government would have to come to court and

4   testify in your presence?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you understand that you would have the

7   right to confront those witnesses?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand that your attorney could

10  cross-examine the witnesses for the government, object to

11  evidence offered by the government and offer evidence on your

12  behalf at trial?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Do you understand that by pleading guilty,

15  you're giving up the right to any further challenge to the

16  manner in which the government obtained evidence against you?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Do you understand that the evidence you

19  could challenge would include any admissions or confessions

20  made by you, any physical evidence, any wiretap evidence or any

21  identification evidence?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Do you understand that at trial you would

24  have the right to subpoena and compel the attendance of

25  witnesses?

1            THE DEFENDANT:  Yes.

2            THE COURT:  And do you understand that at trial you

3   would have the right to present witnesses, including character

4   witnesses whose testimony could raise a reasonable doubt?

5            THE DEFENDANT:  Yes.

6            THE COURT:  Do you understand that at trial, while you

7   would have the right to testify if you chose to do so, you also

8   would have the right not to testify?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Do you understand that no inference or

11  suggestion of guilt could be drawn from the fact that you did

12  not testify?

13           THE DEFENDANT:  Yes.

14           THE COURT:  Do you understand that you have the right

15  not to be compelled to incriminate yourself?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Do you understand that your attorney could

18  argue to the jury and to the Court on your behalf and against

19  the government's case at trial?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Do you understand that you could only be

22  convicted by a jury that unanimously found you guilty?

23           THE DEFENDANT:  Yes.

24           THE COURT:  If at trial you were found guilty, do you

25  understand that after trial, you would be able to appeal the

1   guilty verdict to an appellate court?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Do you understand that you could have a

4   lawyer represent you in such an appeal?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you understand that the appellate court

7   might reverse the conviction?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand that by pleading guilty,

10  you're giving up your right to appeal from any conviction after

11  trial?

12         THE DEFENDANT:  Yes.

13         THE COURT:  And do you understand as set out in your

14  guilty plea agreement that you are expressly and voluntarily

15  waiving, meaning giving up forever, all your rights to appeal

16  or collaterally attack your conviction, sentence or any other

17  matter relating to this prosecution and that this waiver

18  includes a waiver of the right to appeal or collaterally attack

19  under any provision of law?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Do you understand that if I accept your

22  guilty plea, the only issues you may raise on direct appeal

23  from that guilty plea or in a petition for collateral relief

24  would be that I impose a sentence that exceeds the statutory

25  maximum for any count of conviction, a challenge to an upward

1  departure or variance that I imposed under the sentencing

2  guidelines, or that your attorney here, Mr. Neff, provided you

3  with constitutionally ineffective assistance?

4          THE DEFENDANT:  Yes.

5          THE COURT:  In addition, if the government appeals

6  from the sentence I impose, you understand that you may also

7  appeal from that sentence?

8          THE DEFENDANT:  Yes.

9          THE COURT:  If you plead guilty and I accept your

10 plea, do you understand that you will waive your right to a

11 further trial of any kind as well as the other rights I have

12 just described?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Do you understand there will be no trial?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Do you understand that if you plead guilty

17 and I accept your plea, I will enter a judgment of guilty and

18 sentence you on the basis of your guilty plea and in accordance

19 with the advisory sentencing guidelines after considering a

20 presentence report?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you understand you're pleading guilty

23 to the charges I described earlier, Counts 1 through 19, each

24 charging healthcare fraud, and Counts 20 through 42, charging

25 distribution of Schedule II and Schedule IV controlled

1  substances outside the usual course of professional practice

2  and without legitimate purposes?  Do you understand those are

3  the charges to which you're pleading guilty here today?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Do you understand that the essential

6  elements of each crime charged in Counts 1 through 19, each

7  charging healthcare fraud, to which you're pleading guilty here

8  today and which the government would have to prove beyond a

9  reasonable doubt at any trial are, first, that you knowingly

10  devised or participated in a scheme to defraud a healthcare

11  benefit program in connection with the delivery of or payment

12  for healthcare benefits, items or services; second, that you

13  acted with intent to defraud; and third, that the healthcare

14  benefit program was a public or private plan or contract

15  affecting commerce under which medical benefits, items or

16  services were provided to an individual?  You understand that

17  the government would have to prove these three elements to

18  secure your conviction for each of the 19 counts of healthcare

19  fraud charged in Counts 1 through 19 of the indictment to which

20  you're pleading guilty here today?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Do you understand that the essential

23  elements of each of the crimes charged in Counts 20 through 42,

24  distribution of Schedule II and Schedule IV controlled

25  substances outside the usual course of professional practice

1   and without a legitimate medical purpose, to which you're

2   pleading guilty here today and which the government would have

3   to prove beyond a reasonable doubt at any trial are:  First,

4   that you distributed a mixture or substance containing a

5   controlled substance; second, that you distributed the

6   controlled substance knowingly or intentionally; and third,

7   that the controlled substance was oxycodone and/or tramadol

8   and/or quazepam?  You understand the government would have to

9   prove those three elements beyond a reasonable doubt to secure

10  your conviction for each count charged in Counts 20 through 42

11  to which you're pleading guilty here today?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Ms. Leahy, could you please state the

14  maximum penalty, fine, special assessment, forfeiture and any

15  mandatory minimum penalty.

16          MS. LEAHY:  Yes, Your Honor.

17          By each count?

18          THE COURT:  Well --

19          MS. LEAHY:  Or just the total?

20          THE COURT:  -- why don't you describe these for

21  Counts 1 through 19 and then for Counts 20 through 42.  So

22  you're talking first for each count and then collectively.

23          MS. LEAHY:  Okay.  For healthcare fraud, for each

24  count of healthcare fraud, the maximum sentence, the statutory

25  sentence, is 10 years, 3 years of supervised release, a

1    $250,000 fine and a $100 special assessment.  The defendant is

2    charged with 19 counts of healthcare fraud, thus producing a

3    statutory maximum sentence of 190 years imprisonment, 3 years

4    of supervised release, fines of approximately $4,750,000, and a

5    $1,900 special assessment.

6              Distribution of Schedule II controlled substances.

7    For each count of distributing oxycodone, a Schedule II

8    controlled substance, the maximum sentence is 20 years

9    imprisonment, a minimum of 3 years of supervised release up to

10   lifetime supervised release, a fine of $1 million and a special

11   assessment of $100.  The defendant is charged with 22 counts of

12   distributing of --

13             THE COURT:  22 or 23?

14             MS. LEAHY:  The 23rd count is Schedule IV, so --

15   right?

16             THE COURT:  I believe he's charged with 23 counts.

17             MS. LEAHY:  I believe it's 22 counts of Schedule II

18   and one count of Schedule IV.  That's the 23.

19             THE COURT:  Okay.

20             MS. LEAHY:  And they have different statutory amounts.

21             THE COURT:  Okay.  Go on.  Sorry.

22             MS. LEAHY:  That's okay.

23             The defendant is charged with 22 counts of

24   distributing oxycodone, thus producing a statutory maximum and

25   minimum sentence of 440 years imprisonment, a minimum of 3

1   years up to a lifetime of supervised release, fines of

2   $22 million and a $2,200 special assessment.

3           Distribution of Schedule IV controlled substance.  The

4   defendant is charged with one count of Schedule IV,

5   distributing tramadol and/or quazepam, which are Schedule IV

6   controlled substances.  The maximum sentence is 5 years

7   imprisonment, a minimum of 1 year up to lifetime supervised

8   release, a $250,000 fine and a $100 special assessment.  If

9   convicted of these offenses, the defendant faces a total

10  statutory maximum and minimum penalties of 635 years

11  imprisonment, a minimum of 3 years supervised release up to

12  lifetime supervised release, fines of $27 million and a special

13  assessment of $4,200.

14          THE COURT:  Mr. Berkowitz, do you understand the

15  penalties set forth by Ms. Leahy, including the maximum total

16  penalty and the mandatory minimum penalty?

17          THE DEFENDANT:  Yes, I do.

18          THE COURT:  Mr. Berkowitz, has Mr. Neff discussed the

19  sentencing guidelines with you?

20          THE DEFENDANT:  Yes, he has.

21          THE COURT:  Do you understand that the guidelines are

22  one factor I will consider in fashioning the sentence I will

23  impose on you?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Do you understand that the other factors I

1 will consider -- and these are set out in the acknowledgment of
2 rights form that you reviewed with Mr. Berkowitz and signed --
3 will include the nature and circumstances of the offenses to
4 which you have pled guilty, your history and characteristics
5 and the pertinent Sentencing Commission policy statements, such
6 as the need to avoid unwarranted sentencing disparities, the
7 need to provide restitution to victims, the need for the
8 sentence to impose -- excuse me, the need for the sentence to
9 provide for just punishment for the offenses to which you've
10 pled guilty, the need to provide adequate deterrence of
11 criminal conduct, the need to promote further respect for the
12 law and the need to protect the public from any further crimes
13 you might commit?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Do you understand that I will not be able
16 to determine the sentence I will impose on you until after a
17 presentence report is completed, you and the government have
18 had the opportunity to object to the presentence report and
19 I've had a chance to review all the relevant factors, including
20 the sentencing guidelines?

21          THE DEFENDANT:  Yes, I understand.

22          THE COURT:  Do you understand that I could in
23 appropriate circumstances impose a sentence that is less severe
24 or more severe than the sentence provided under the guidelines?

25          THE DEFENDANT:  I understand.

1          THE COURT:  Do you understand that parole has been
2   abolished and that you will not be released on parole if you
3   are sent to prison?
4          THE DEFENDANT:  I understand.
5          THE COURT:  Do you understand that if you are sent to
6   prison, a term of supervised release will be imposed when you
7   are released from prison?
8          THE DEFENDANT:  I understand.
9          THE COURT:  You understand that supervised release may
10  be revoked if you violate its terms and conditions?
11         THE DEFENDANT:  I understand.
12         THE COURT:  Do you understand -- and this is set out
13  in your guilty plea agreement -- that when supervised release
14  is revoked, the original term of imprisonment may be increased
15  by not more than two years for each count in the indictment to
16  which you're pleading guilty for a total potential increased
17  term of imprisonment of 84 years?
18         THE DEFENDANT:  I understand.
19         THE COURT:  Do you understand that on the basis of a
20  guilty plea, you may receive a sentence up to the maximum
21  permitted by law?
22         THE DEFENDANT:  I understand.
23         THE COURT:  Do you understand that you will not be
24  entitled to withdraw your guilty plea if I impose a more severe
25  sentence than you expect or than anyone else recommends?

1          THE DEFENDANT:  I understand.

2          THE COURT:  Have you discussed with Mr. Neff the

3    charges against you, your right to contest those charges, the

4    maximum possible penalty and mandatory minimum penalty?

5          THE DEFENDANT:  Yes, I have.

6          THE COURT:  Do you understand that by pleading guilty

7    and by waiving the rights I have discussed with you, you cannot

8    later come to any court and claim that you are not guilty or

9    that your rights have been violated?

10         THE DEFENDANT:  I understand.

11         THE COURT:  Do you understand that the offenses to

12   which you are pleading guilty here today are felonies and that

13   if I accept your plea, I will adjudge you guilty of those

14   felonies and that such an adjudication may deprive you of

15   valuable civil rights, such as the right to vote, the right to

16   hold public office, the right to serve on a jury and the right

17   to possess any kind of firearm?

18         THE DEFENDANT:  I understand.

19         THE COURT:  Do you understand that a plea of guilty

20   may be used against you by the government in a possible civil

21   action to collect taxes and penalties?

22         THE DEFENDANT:  I understand.

23         THE COURT:  Do you understand that a plea of guilty

24   may affect the status of your professional license to practice

25   medicine?

1          THE DEFENDANT:  I understand.

2          THE COURT:  Do you understand that I'm authorized to

3    order restitution by you to victims of your crimes, including

4    restitution for property loss, personal injury or death?

5          THE DEFENDANT:  I understand.

6          THE COURT:  Do you understand that I may be authorized

7    to order you to forfeit property as described in the notice of

8    forfeiture filed by the government?

9          THE DEFENDANT:  I understand.

10          THE COURT:  Having heard from me what your rights are

11    if you plead not guilty and what may occur if you plead guilty,

12    do you still want to give up your rights to a trial and plead

13    guilty?

14          THE DEFENDANT:  Yes, I do.

15          THE COURT:  Ms. Leahy and Mr. Neff, are you satisfied

16    as to Mr. Berkowitz's competence to enter a plea?

17          MS. LEAHY:  The government is satisfied, Your Honor.

18          MR. NEFF:  I'm satisfied, Your Honor.

19          THE COURT:  Are you satisfied that the willingness to

20    plead guilty is voluntary?

21          MS. LEAHY:  Yes, Your Honor.

22          MR. NEFF:  Yes, Your Honor.

23          THE COURT:  Are you satisfied that any guilty plea is

24    not based on any plea agreement except as disclosed on this

25    record?

1          MS. LEAHY:  Yes, Your Honor.

2          MR. NEFF:  Yes, Your Honor.

3          THE COURT:  Are you satisfied that any guilty plea is

4    being made with a full understanding by Mr. Berkowitz of the

5    nature of the charges, of the maximum possible penalty and

6    mandatory minimum penalty provided by law and of Mr.

7    Berkowitz's legal rights to contest the charges?

8          MS. LEAHY:  Yes, Your Honor.

9          MR. NEFF:  Yes, Your Honor.

10         THE COURT:  Are you satisfied that there is a factual

11   basis for the plea?

12         MS. LEAHY:  Yes, Your Honor.

13         MR. NEFF:  Yes, sir.

14         THE COURT:  Mr. Neff, under the Supreme Court's

15   decision in Missouri v. Frye, you have a duty to communicate to

16   your client all formal offers from the government to accept a

17   plea on terms and conditions that may be favorable to him.

18         Have you in fact done so?

19         MR. NEFF:  I have, sir.

20         THE COURT:  Does either of you have any additional

21   questions to pose before we take the plea?

22         MS. LEAHY:  Not from the government.

23         MR. NEFF:  No, Your Honor.

24         THE COURT:  Mr. Berkowitz, you'll have the opportunity

25   to address me at sentencing.  Is there anything you would like

1    to say to me at this time?  I'm not suggesting you should say

2    anything at this time, but if you wish to, I am giving you that

3    opportunity.

4            THE DEFENDANT:  No, thank you.  I just appreciate the

5    time.

6            THE COURT:  Could we plea take the plea.

7            THE DEPUTY CLERK:  Under Criminal Docket Number

8    2019-356, you are charged with 19 counts of healthcare fraud

9    and 23 counts of distribution of controlled substances outside

10   the usual course of professional practice and without a

11   legitimate medical purpose.

12           How do you plead, guilty or not guilty?

13           THE DEFENDANT:  Guilty.

14           THE COURT:  Please be seated.

15           I find that the defendant is competent to plead, that

16   his plea of guilty is voluntary and not the result of force or

17   threats or any promises apart from the plea agreement disclosed

18   on this record, that there is a factual basis for the plea of

19   guilty, that the defendant understands the charges against him,

20   his legal rights, the maximum possible penalty and mandatory

21   minimum penalty and that the defendant understands he's waiving

22   his right to a trial.  Accordingly, I accept the plea of

23   guilty.

24           I will order a presentence investigation report by

25   probation.  Sentencing is set for May 4th at 11:00 a.m.

1          Under the Statute 18 U.S.C. -- I believe it's Section

2    3142 and 3143, a defendant who is convicted of certain

3    controlled substance offenses is subject to a rebuttable

4    presumption that no condition or combination of conditions will

5    reasonably assure his appearance or the safety of the

6    community.

7          Mr. Neff, do you have any evidence to present to rebut

8    that presumption here?

9          MR. NEFF:  Your Honor, we've discussed it with the

10   government, and I think we both are asking the Court to allow

11   him to remain on the same bail.

12         THE COURT:  Your answer is you have no evidence?

13         MR. NEFF:  I have no one to present today.  I just

14   have argument.

15         THE COURT:  Okay.

16         MR. NEFF:  And the argument would be, Your Honor, that

17   he has been on bail since the indictment.  He has followed all

18   the reporting requirements.  He has to make many financial

19   decisions over the next couple of months to satisfy the

20   forfeiture, restitution and the civil penalties that we've

21   agreed to pay.  And that involves selling properties,

22   disgorging money from accounts and getting all that lined up so

23   that it's done before sentencing.  And only he can do that.

24         He's turned in his passport.  He's not a risk of

25   flight.  He's closed the practice.  He's not a threat to the

1   community.  He's not working as a physician now.  So he would

2   not be a threat to the community, certainly.  And he's not a

3   risk of flight.

4          THE COURT:  I guess your client is going to have to

5   give you a power of attorney.  You've presented no evidence,

6   only argument.

7          The vast amount of money your client has stolen makes

8   him more of a flight risk, not less.  His profound dishonesty

9   over a substantial period to steal a vast amount of money and

10  work untold harm on the community -- he is a common drug dealer

11  as far as this evidence shows me.  And the presumption is

12  perfectly appropriate to apply to him in these circumstances.

13         The vast amount of money he's made, his admitted

14  substantial dishonesty absolutely supports the presumption that

15  he is a flight risk and a danger to the community, and I am

16  going to order him to be detained.

17         My thanks to counsel and to court security.

18         (Proceedings concluded at 10:28 a.m.)

19

20         I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22

23  _____

24  Ann Marie Mitchell, CRR, RDR, RMR
    Official Court Reporter
25

**$1,388.50** [1] - 23:16
**$1,895.17** [1] - 23:23
**$1,900** [1] - 36:5
**$100** [3] - 36:1, 36:11, 37:8
**$11,259** [1] - 20:20
**$141,329** [1] - 21:13
**$185** [1] - 22:22
**$2,000** [1] - 25:16
**$2,200** [1] - 37:2
**$22** [1] - 37:2
**$250,000** [2] - 36:1, 37:8
**$27** [1] - 37:12
**$4,000** [2] - 24:24, 25:22
**$4,200** [1] - 37:13
**$4,338** [1] - 20:21
**$4,750,000** [1] - 36:4
**$40,000** [1] - 24:8
**$756** [1] - 25:19
**$9,376,214** [4] - 14:19, 27:17, 27:19, 27:20
**1** [14] - 13:2, 19:25, 20:3, 20:9, 20:12, 20:13, 20:18, 28:2, 33:23, 34:6, 34:19, 35:21, 36:10, 37:7
**1's** [1] - 20:13
**10** [8] - 8:15, 8:16, 11:12, 17:14, 21:22, 24:12, 24:21, 35:25
**100** [1] - 14:22
**10:28** [1] - 45:18
**10s** [1] - 24:11
**11:00** [1] - 43:25
**1250** [1] - 1:15
**13** [1] - 24:7
**1300** [1] - 2:4
**1347** [1] - 13:17
**15** [1] - 11:12
**16** [1] - 14:11
**17** [2] - 14:11, 22:9
**18** [2] - 13:16, 44:1
**1845** [1] - 2:3
**19** [10] - 13:2, 13:15, 28:20, 33:23, 34:6, 34:18, 34:19, 35:21, 36:2, 43:8
**190** [1] - 36:3
**19103** [1] - 2:4
**19106** [2] - 1:8, 1:16
**2** [11] - 20:7, 20:22, 20:25, 21:5, 21:8, 21:14, 21:15, 21:16, 21:20, 28:2
**2's** [2] - 21:4, 21:7
**2.8** [1] - 14:1
**20** [7] - 13:3, 14:21, 33:24, 34:23, 35:10, 35:21, 36:8
**2015** [4] - 20:7, 21:4, 21:11, 27:16
**2016** [1] - 21:12
**2017** [1] - 21:24
**2019** [1] - 27:16

**2019-356** [1] - 43:8
**2020** [1] - 1:8
**21** [1] - 13:19
**215** [2] - 1:17, 2:5
**22** [4] - 36:11, 36:13, 36:17, 36:23
**23** [6] - 13:17, 28:24, 36:13, 36:16, 36:18, 43:9
**23rd** [1] - 36:14
**24** [3] - 1:8, 5:11, 6:5
**267** [1] - 1:22
**299-7250** [1] - 1:22
**2:19-cr-00356** [1] - 1:3
**3** [19] - 22:1, 22:4, 22:8, 22:18, 22:21, 22:22, 23:6, 23:11, 23:13, 23:14, 23:18, 23:20, 28:2, 35:25, 36:3, 36:9, 36:25, 37:11
**3's** [2] - 22:21, 23:7
**3-and-a-half** [1] - 13:25
**3.4** [1] - 14:5
**30** [1] - 24:3
**3142** [1] - 44:2
**3143** [1] - 44:2
**4** [31] - 17:14, 22:1, 22:5, 22:8, 23:25, 24:1, 24:3, 24:9, 24:13, 24:17, 24:20, 25:1, 25:4, 25:6, 25:11, 25:14, 25:17, 25:20, 25:24, 26:2, 26:4, 26:6, 26:8, 26:9, 26:12, 26:17, 27:1, 28:3
**4's** [4] - 24:10, 25:6, 25:10, 25:25
**400** [1] - 14:22
**42** [7] - 13:3, 13:7, 14:21, 33:24, 34:23, 35:10, 35:21
**440** [1] - 36:25
**4th** [1] - 43:25
**5** [5] - 17:14, 23:5, 23:13, 23:21, 37:6
**50** [1] - 27:10
**563-9800** [1] - 2:5
**6** [2] - 14:17, 17:14
**6.3** [1] - 13:24
**60** [2] - 4:23, 24:2
**601** [1] - 1:7
**615** [1] - 1:16
**635** [1] - 37:10
**7** [1] - 17:14
**8** [1] - 17:14
**800** [1] - 24:6
**84** [1] - 39:17
**841(a)(1)** [1] - 13:19
**861-8343** [1] - 1:17
**9** [1] - 17:14
**9:40** [2] - 1:9, 3:1
**A+** [1] - 24:14
**a.m** [1] - 1:9, 3:1, 43:25, 45:18

**ability** [3] - 5:23, 6:1, 11:6
**able** [3] - 4:2, 31:25, 38:15
**abolished** [1] - 39:2
**above-entitled** [1] - 45:21
**abruptly** [1] - 24:2
**absolutely** [1] - 45:14
**abused** [1] - 14:19
**accept** [8] - 16:5, 16:9, 32:21, 33:9, 33:17, 40:13, 42:16, 43:22
**acceptance** [1] - 14:24
**accepted** [2] - 18:10, 25:20
**accident** [5] - 25:3, 25:5, 25:7, 25:11, 25:12
**accordance** [1] - 33:18
**accordingly** [1] - 43:22
**accounts** [1] - 44:22
**accurately** [2] - 26:14, 28:9
**acknowledgment** [2] - 16:21, 38:1
**acted** [1] - 34:13
**action** [1] - 40:21
**ACTION** [1] - 1:3
**acupuncture** [3] - 25:18, 26:7, 26:9
**acupuncturist** [2] - 26:3, 26:10
**addiction** [1] - 6:8
**addition** [4] - 21:19, 25:13, 27:13, 33:5
**additional** [2] - 25:23, 42:20
**address** [1] - 42:25
**adequate** [1] - 38:10
**adhere** [1] - 27:25
**adjudge** [1] - 40:13
**adjudication** [1] - 40:14
**adjustment** [1] - 15:2
**Administration** [1] - 17:25
**admissions** [1] - 30:19
**admitted** [1] - 45:13
**admitting** [1] - 28:17
**advisory** [1] - 33:19
**Aetna** [1] - 27:14
**affect** [3] - 5:23, 6:1, 40:24
**affected** [1] - 15:24
**affecting** [1] - 34:15
**afford** [1] - 12:10
**agent** [2] - 27:13, 27:15
**ago** [2] - 7:3, 15:20
**agreed** [6] - 13:15, 13:23, 14:6, 24:11, 25:24, 44:21
**agreement** [12] - 13:9, 13:13, 13:15, 14:2, 14:11, 14:23, 15:4, 15:8, 15:11, 15:14, 15:20, 16:4, 16:5, 16:9, 16:12, 16:22, 16:25, 17:6, 32:14, 39:13, 41:24, 43:17
**agrees** [1] - 14:4
**ahead** [1] - 26:24

**aided** [1] - 1:24
**alcoholic** [1] - 6:4
**alleges** [1] - 17:11
**allow** [1] - 44:10
**AMERICA** [1] - 1:3
**America** [1] - 1:18
**amount** [6] - 14:17, 23:12, 24:10, 45:7, 45:9, 45:13
**amounts** [1] - 36:20
**ample** [1] - 12:15
**analgesics** [2] - 18:14, 19:1
**Andrew** [2] - 3:12, 4:21
**ANDREW** [2] - 1:5, 3:9
**Ann** [2] - 1:21, 45:24
**answer** [6] - 8:12, 10:6, 11:19, 15:13, 16:24, 44:12
**answers** [2] - 3:16, 3:20
**ANTHONY** [1] - 1:15
**anthony.scicchitano@ usdoj.gov** [1] - 1:18
**anti** [2] - 18:14, 19:1
**anti-inflammatories** [2] - 18:14, 19:1
**anticipate** [1] - 17:13
**antidepressant** [3] - 6:16, 6:18, 8:9
**anxiety** [2] - 8:21, 18:15
**apart** [1] - 43:17
**apnea** [4] - 6:21, 8:3, 8:8, 9:22
**appeal** [8] - 12:11, 31:25, 32:4, 32:10, 32:15, 32:18, 32:22, 33:7
**appeals** [1] - 33:5
**appearance** [1] - 44:5
**APPEARANCES** [2] - 1:13, 2:1
**appellate** [3] - 14:6, 32:1, 32:6
**apply** [1] - 45:12
**appoint** [1] - 12:11
**appointment** [8] - 22:9, 22:21, 23:11, 23:20, 23:25, 25:3, 25:10, 26:1
**appointments** [1] - 22:9
**appreciate** [2] - 4:16, 43:4
**approach** [1] - 15:5
**approached** [1] - 26:1
**appropriate** [2] - 38:23, 45:12
**April** [2] - 21:24, 27:16
**area** [1] - 26:2
**argue** [1] - 31:18
**argument** [3] - 44:14, 44:16, 45:6
**aspirin** [3] - 5:16, 9:20, 9:21
**asserting** [1] - 19:6
**assessment** [8] - 18:21, 35:14, 36:1, 36:5, 36:11,

37:2, 37:8, 37:13
**assistance** [2] - 29:13, 33:3
**assume** [1] - 3:16
**assurance** [1] - 16:3
**assure** [1] - 44:5
**atrial** [2] - 9:16, 9:18
**attack** [3] - 14:7, 32:16, 32:18
**attempts** [1] - 20:14
**attendance** [1] - 30:24
**attorney** [8] - 12:6, 12:10, 12:13, 29:10, 30:9, 31:17, 33:2, 45:5
**ATTORNEY'S** [1] - 1:14
**audio** [1] - 22:10
**August** [1] - 21:11
**authorized** [2] - 41:2, 41:6
**auto** [2] - 25:5, 25:12
**Avenue** [1] - 18:4
**avoid** [2] - 14:25, 38:6
**baby** [2] - 9:20, 9:21
**bad** [1] - 10:18
**bag** [11] - 19:4, 19:22, 20:12, 20:15, 20:20, 23:14, 23:22, 23:24, 24:22, 24:24, 27:6
**bags** [4] - 19:9, 19:10, 19:12, 27:8
**bail** [2] - 44:11, 44:17
**base** [1] - 14:16
**based** [1] - 41:24
**basis** [9] - 14:25, 17:9, 21:10, 21:23, 28:6, 33:18, 39:19, 42:11, 43:18
**BEATH** [1] - 1:14
**became** [2] - 20:23, 21:3
**BEFORE** [1] - 1:10
**began** [1] - 19:23
**beginning** [1] - 21:24
**behalf** [2] - 30:12, 31:18
**benefit** [3] - 22:15, 34:11, 34:14
**benefits** [2] - 34:12, 34:15
**BERKOWITZ** [2] - 1:5, 3:9
**Berkowitz** [19] - 3:12, 3:14, 4:21, 15:10, 16:13, 17:8, 27:4, 27:8, 27:9, 27:15, 27:17, 27:22, 27:24, 28:9, 37:14, 37:18, 38:2, 42:4, 42:24
**Berkowitz's** [2] - 41:16, 42:7
**Bernstein** [2] - 10:1, 10:11
**best** [1] - 15:21
**better** [1] - 8:25
**beverages** [1] - 6:4
**beyond** [5] - 17:21, 29:21, 34:8, 35:3, 35:9
**biggest** [1] - 23:2
**bilateral** [1] - 10:12
**bill** [1] - 27:8

**billed** [8] - 18:16, 20:19, 23:15, 23:23, 24:23, 25:16, 25:19, 25:21
**billing** [2] - 25:23, 26:10
**bit** [2] - 7:5, 9:8
**biweekly** [1] - 21:23
**blood** [6] - 5:14, 5:15, 7:19, 7:23, 9:19, 23:7
**Blue** [1] - 19:24
**body** [1] - 23:7
**bottles** [1] - 24:22
**boxes** [1] - 24:23
**brands** [1] - 18:13
**briefly** [1] - 5:4
**brought** [2] - 13:1, 13:7
**bucks** [1] - 24:6
**Byrne** [1] - 1:7
**cannot** [2] - 12:9, 40:7
**car** [1] - 25:3
**cardio** [2] - 5:16
**care** [3] - 6:11, 20:11, 23:17
**Caremark** [1] - 27:14
**case** [10] - 12:10, 12:11, 12:16, 12:22, 13:10, 16:6, 16:10, 17:20, 27:13, 31:19
**cash** [1] - 22:22
**cautioned** [1] - 22:25
**Celebrex** [1] - 21:9
**Celecoxib** [1] - 20:15
**cell** [1] - 25:4
**certain** [1] - 44:2
**certainly** [1] - 45:2
**certify** [1] - 45:20
**cervical** [1] - 10:12
**challenge** [3] - 30:15, 30:19, 32:25
**chance** [2] - 15:10, 38:19
**CHANGE** [1] - 1:5
**character** [1] - 31:3
**characteristics** [1] - 38:4
**charged** [12] - 4:8, 19:2, 34:6, 34:19, 34:23, 35:10, 36:2, 36:11, 36:16, 36:23, 37:4, 43:8
**charges** [10] - 12:22, 13:1, 13:7, 33:23, 34:3, 40:3, 42:5, 42:7, 43:19
**charging** [5] - 13:2, 13:3, 33:24, 34:7
**Chestnut** [1] - 1:16
**chiropractor** [1] - 24:14
**chlorzoxazone** [1] - 24:22
**chose** [1] - 31:7
**circumstances** [3] - 38:3, 38:23, 45:12
**civil** [4] - 14:1, 40:15, 40:20, 44:20
**civilians** [1] - 21:24
**claim** [3] - 25:5, 25:8, 40:8

**claims** [9] - 18:8, 19:5, 19:17, 21:12, 22:14, 27:5, 27:11, 27:13, 27:17
**clear** [1] - 4:15
**clearly** [1] - 11:22
**clerk** [1] - 3:7
**client** [6] - 20:3, 20:25, 22:4, 42:16, 45:4, 45:7
**closed** [2] - 24:2, 44:25
**closer** [2] - 3:25, 7:7
**Code** [2] - 13:17, 13:19
**collateral** [1] - 32:23
**collaterally** [3] - 14:7, 32:16, 32:18
**collect** [1] - 40:21
**collectively** [2] - 22:8, 35:22
**College** [1] - 5:3
**combination** [2] - 18:25, 44:4
**coming** [1] - 6:17
**Commencing** [1] - 1:9
**commerce** [1] - 34:15
**Commission** [1] - 38:5
**commit** [1] - 38:13
**committing** [2] - 28:21, 29:3
**common** [1] - 45:10
**communicate** [1] - 42:15
**community** [5] - 44:6, 45:1, 45:2, 45:10, 45:15
**compel** [1] - 30:24
**compelled** [1] - 31:15
**competence** [1] - 41:16
**competent** [3] - 4:2, 29:20, 43:15
**complaints** [2] - 19:23, 25:12
**completed** [2] - 22:9, 38:17
**compressed** [1] - 10:15
**computer** [1] - 1:24
**computer-aided** [1] - 1:24
**concluded** [1] - 45:18
**condition** [1] - 44:4
**conditions** [3] - 39:10, 42:17, 44:4
**conduct** [1] - 38:11
**confessions** [1] - 30:19
**confront** [1] - 30:7
**connection** [3] - 15:14, 16:25, 34:11
**consciousness** [5] - 22:25, 26:11, 26:16, 26:19, 26:25
**consider** [2] - 37:22, 38:1
**considering** [1] - 33:19
**constitutionally** [1] - 33:3
**consultation** [1] - 24:25
**contact** [1] - 25:2
**containing** [3] - 23:14, 24:22, 35:4
**contest** [3] - 14:4, 40:3, 42:7
**continue** [1] - 21:4

**CONTINUED** [1] - 2:1
**contract** [1] - 34:14
**controlled** [27] - 13:4, 13:18, 13:20, 18:1, 18:7, 18:15, 19:2, 19:9, 19:16, 20:17, 21:20, 21:22, 22:12, 23:19, 28:1, 28:25, 33:25, 34:24, 35:5, 35:6, 35:7, 36:6, 36:8, 37:3, 37:6, 43:9, 44:3
**convicted** [3] - 31:22, 37:9, 44:2
**conviction** [7] - 14:7, 32:7, 32:10, 32:16, 32:25, 34:18, 35:10
**cooperating** [1] - 27:3
**copy** [1] - 12:21
**correct** [14] - 3:17, 5:9, 6:13, 7:21, 7:25, 8:13, 11:21, 12:13, 16:19, 17:6, 17:17, 28:15, 45:20
**counsel** [2] - 29:14, 45:17
**counseling** [2] - 20:19, 23:8
**count** [11] - 13:2, 32:25, 35:10, 35:17, 35:22, 35:24, 36:7, 36:14, 36:18, 37:4, 39:15
**counts** [12] - 13:16, 13:17, 28:20, 28:24, 34:18, 36:2, 36:11, 36:16, 36:17, 36:23, 43:8, 43:9
**Counts** [11] - 13:2, 13:3, 14:21, 33:23, 33:24, 34:6, 34:19, 34:23, 35:10, 35:21
**couple** [2] - 6:16, 44:19
**course** [10] - 13:5, 13:21, 18:1, 22:13, 28:3, 29:1, 30:2, 34:1, 34:25, 43:10
**court** [5] - 30:3, 32:1, 32:6, 40:8, 45:17
**COURT** [1] - 1:1
**Court** [3] - 1:22, 3:1, 45:24
**Court's** [1] - 42:14
**Courthouse** [1] - 1:7
**cover** [1] - 18:19
**covered** [1] - 18:9
**CPAP** [1] - 9:23
**Craig** [1] - 9:15
**crime** [1] - 34:6
**crimes** [5] - 28:22, 29:3, 34:23, 38:12, 41:3
**CRIMINAL** [1] - 1:3
**criminal** [2] - 17:9, 38:11
**Criminal** [1] - 43:7
**Cross** [1] - 19:24
**cross** [1] - 30:10
**cross-examine** [1] - 30:10
**CRR** [2] - 1:21, 45:24
**CVS** [1] - 27:14
**cyclobenzaprine** [3] - 20:16, 21:9, 23:15

**danger** [1] - 45:15
**date** [1] - 14:23
**David** [1] - 10:21
**DEA** [2] - 23:2, 24:16
**dealer** [1] - 45:10
**death** [1] - 41:4
**decision** [1] - 42:15
**decisions** [1] - 44:19
**Defendant** [3] - 2:6, 27:4, 27:15
**defendant** [78] - 3:6, 3:7, 3:8, 13:15, 13:20, 13:23, 14:4, 14:6, 14:9, 14:19, 14:24, 17:23, 18:2, 18:6, 18:12, 18:18, 18:20, 18:24, 19:4, 19:5, 19:8, 19:15, 19:20, 19:24, 20:7, 20:9, 20:11, 20:12, 20:19, 21:5, 21:7, 21:12, 21:21, 22:9, 22:12, 22:22, 22:24, 23:5, 23:6, 23:12, 23:16, 23:21, 23:23, 24:5, 24:8, 24:11, 24:13, 24:14, 24:17, 24:21, 24:23, 24:24, 25:4, 25:6, 25:11, 25:14, 25:17, 25:19, 25:20, 25:24, 26:1, 26:2, 26:3, 26:7, 26:8, 26:9, 26:12, 26:17, 27:1, 36:1, 36:11, 36:23, 37:4, 37:9, 43:15, 43:19, 43:21, 44:2
**DEFENDANT** [147] - 3:9, 3:12, 3:18, 3:23, 4:5, 4:9, 4:12, 4:16, 4:19, 4:21, 4:23, 5:1, 5:3, 5:6, 5:9, 5:12, 5:14, 5:19, 5:21, 5:25, 6:3, 6:6, 6:9, 6:14, 6:19, 6:21, 7:1, 7:3, 7:8, 7:13, 7:15, 7:18, 7:21, 7:23, 7:25, 8:3, 8:5, 8:7, 8:10, 8:13, 8:15, 8:18, 8:20, 8:22, 8:25, 9:3, 9:5, 9:9, 9:12, 9:14, 9:20, 9:22, 10:4, 10:10, 10:15, 10:18, 10:24, 11:2, 11:5, 11:8, 11:12, 11:15, 11:17, 11:21, 11:25, 12:2, 12:4, 12:8, 12:12, 12:14, 12:17, 12:20, 12:24, 13:8, 15:12, 15:15, 15:18, 15:22, 16:2, 16:7, 16:11, 16:14, 16:16, 16:19, 16:23, 17:1, 17:4, 17:7, 28:11, 28:13, 28:16, 28:19, 28:23, 29:4, 29:8, 29:11, 29:15, 29:18, 29:23, 30:1, 30:5, 30:8, 30:13, 30:17, 30:22, 31:1, 31:5, 31:9, 31:13, 31:16, 31:20, 31:23, 32:2, 32:5, 32:8, 32:12, 32:20, 33:4, 33:8, 33:13, 33:15, 33:21, 34:4, 34:21, 35:12, 37:17, 37:20, 37:24,

38:14, 38:21, 38:25, 39:4, 39:8, 39:11, 39:18, 39:22, 40:1, 40:5, 40:10, 40:18, 40:22, 41:1, 41:5, 41:9, 41:14, 43:4, 43:13
**defendant's** [4] - 20:23, 21:3, 25:2, 28:7
**defraud** [2] - 34:10, 34:13
**delivery** [1] - 34:11
**demonstrated** [1] - 14:24
**demonstrating** [4] - 26:11, 26:16, 26:19, 26:25
**departure** [1] - 33:1
**depression** [3] - 8:22, 8:23, 9:8
**deprive** [1] - 40:14
**DEPUTY CLERK** [3] - 3:10, 3:13, 43:7
**dermatologist** [1] - 10:22
**describe** [4] - 5:4, 17:9, 28:9, 35:20
**described** [6] - 6:13, 16:1, 25:20, 33:12, 33:23, 41:7
**despite** [1] - 20:13
**detained** [1] - 45:16
**determine** [1] - 38:16
**deterrence** [1] - 38:10
**devised** [1] - 34:10
**DIAMOND** [1] - 1:10
**different** [1] - 36:20
**difficulty** [1] - 11:19
**direct** [1] - 32:22
**directed** [2] - 26:4, 26:6
**disclosed** [2] - 41:24, 43:17
**discuss** [2] - 12:15, 23:17
**discussed** [4] - 37:18, 40:2, 40:7, 44:9
**disgorging** [1] - 44:22
**dishonesty** [2] - 45:8, 45:14
**disparities** [1] - 38:6
**dispense** [1] - 24:18
**dispensed** [14] - 18:6, 18:18, 18:20, 18:24, 19:4, 20:18, 21:8, 21:14, 21:19, 23:18, 23:24, 25:13, 27:15, 27:21
**distributed** [2] - 35:4, 35:5
**distributing** [5] - 13:20, 36:7, 36:12, 36:24, 37:5
**distribution** [8] - 13:4, 13:17, 28:25, 33:25, 34:24, 36:6, 37:3, 43:9
**DISTRICT** [2] - 1:1, 1:1
**diversion** [1] - 24:5
**Docket** [1] - 43:7
**doctor** [9] - 6:22, 7:16, 8:3, 8:8, 9:25, 10:8, 10:14, 17:23, 24:1
**doctors** [9] - 6:21, 7:12, 7:14, 8:1, 9:10, 10:3, 10:4, 24:7, 24:8

**done** [4] - 17:12, 17:18, 42:18, 44:23
**dosage** [2] - 8:14, 23:8
**doubt** [6] - 17:22, 29:21, 31:4, 34:9, 35:3, 35:9
**down** [1] - 24:16
**downward** [1] - 15:2
**Dr** [11] - 8:5, 8:6, 9:15, 9:23, 9:25, 10:11, 10:18, 10:21, 11:9, 28:1
**drawn** [1] - 31:11
**Drug** [1] - 17:24
**drug** [4] - 5:22, 6:8, 23:1, 45:10
**drugs** [27] - 5:10, 5:22, 5:23, 18:7, 18:13, 18:18, 18:20, 18:22, 18:24, 18:25, 19:4, 19:6, 19:10, 19:19, 19:22, 20:18, 21:14, 21:19, 22:16, 23:14, 23:22, 25:13, 27:6, 27:14, 27:18, 27:20
**drunk** [1] - 6:4
**due** [1] - 25:3
**duly** [1] - 3:9
**duration** [1] - 23:9
**during** [2] - 3:15, 27:21
**duty** [1] - 42:15
**EASTERN** [1] - 1:1
**effect** [3] - 9:7, 11:3, 11:6
**effects** [1] - 23:10
**effort** [2] - 16:5, 16:9
**eight** [1] - 5:7
**either** [1] - 42:20
**electrical** [1] - 25:14
**elements** [4] - 34:6, 34:17, 34:23, 35:9
**emotional** [1] - 11:6
**employed** [1] - 5:6
**employee** [1] - 27:11
**employee's** [1] - 27:11
**employees** [3] - 27:3, 27:6, 27:9
**employment** [1] - 5:5
**encouraged** [1] - 27:6
**Enforcement** [1] - 17:24
**Enis** [1] - 10:21
**enter** [4] - 3:6, 4:2, 33:17, 41:16
**entered** [2] - 14:14, 15:25
**entering** [1] - 4:4
**entitled** [2] - 39:24, 45:21
**equipment** [1] - 25:24
**equivalent** [1] - 14:21
**ESQUIRE** [3] - 1:14, 1:15, 2:3
**essential** [2] - 34:5, 34:22
**eszopiclone** [2] - 19:3, 23:23
**evaluate** [1] - 23:7
**evidence** [12] - 29:20, 30:11,

30:16, 30:18, 30:20, 30:21, 44:7, 44:12, 45:5, 45:11
**examination** [1] - 20:10
**examine** [1] - 30:10
**examined** [1] - 26:4
**example** [1] - 19:24
**exceeds** [1] - 32:24
**except** [1] - 41:24
**exceptions** [1] - 14:8
**excessive** [1] - 19:17
**exchange** [1] - 19:17
**excuse** [1] - 38:8
**executed** [1] - 15:3
**expect** [1] - 39:25
**expert** [1] - 27:23
**explanation** [1] - 25:15
**express** [1] - 21:6
**expressly** [1] - 32:14
**eye** [1] - 26:21
**faces** [1] - 37:9
**fact** [5] - 26:8, 28:21, 29:2, 31:11, 42:18
**factor** [1] - 37:22
**factors** [2] - 37:25, 38:19
**facts** [2] - 17:22, 28:18
**factual** [5] - 14:13, 17:9, 28:6, 42:10, 43:18
**failed** [1] - 27:24
**false** [1] - 3:21
**falsely** [1] - 19:5
**family** [2] - 10:2, 27:7
**fancy** [1] - 25:21
**far** [3] - 4:24, 45:11
**fashioning** [1] - 37:22
**favorable** [1] - 42:17
**favorably** [1] - 24:8
**FBI** [3] - 19:23, 21:25, 25:8
**felonies** [2] - 40:12, 40:14
**fibrillation** [2] - 9:16, 9:18
**file** [1] - 24:15
**filed** [1] - 41:8
**finally** [1] - 27:23
**financial** [3] - 13:23, 14:3, 44:18
**fine** [5] - 9:13, 35:14, 36:1, 36:10, 37:8
**fines** [3] - 36:4, 37:1, 37:12
**finished** [1] - 5:1
**firearm** [1] - 40:17
**first** [4] - 22:21, 34:9, 35:3, 35:22
**five** [2] - 7:13, 7:14
**flight** [4] - 44:25, 45:3, 45:8, 45:15
**followed** [1] - 44:17
**following** [3] - 13:1, 17:22, 22:18
**follows** [1] - 16:21
**force** [1] - 43:16

**foregoing** [1] - 45:20
**forever** [1] - 32:15
**forfeit** [1] - 41:7
**forfeiture** [4] - 14:4, 35:14, 41:8, 44:20
**forgot** [1] - 6:15
**form** [2] - 16:21, 38:2
**formal** [1] - 42:16
**former** [1] - 27:3
**forth** [1] - 37:15
**four** [1] - 24:22
**Frankl** [2] - 9:15
**fraud** [13] - 13:3, 13:16, 14:17, 14:18, 19:23, 28:21, 33:24, 34:7, 34:19, 35:23, 35:24, 36:2, 43:8
**fraudulent** [4] - 22:14, 26:10, 27:5, 27:10
**frequency** [1] - 23:9
**friends** [1] - 27:7
**Frye** [1] - 42:15
**full** [3] - 3:10, 4:20, 42:4
**functions** [1] - 23:8
**Gabon** [1] - 11:9
**generic** [2] - 18:6, 18:13
**George** [2] - 10:11, 10:18
**glorified** [1] - 23:1
**goodie** [4] - 19:10, 19:12, 27:6, 27:8
**government** [25] - 14:5, 14:25, 15:1, 15:25, 17:11, 22:11, 27:4, 28:5, 29:19, 30:3, 30:10, 30:11, 30:16, 33:5, 34:8, 34:17, 35:2, 35:8, 38:17, 40:20, 41:8, 41:17, 42:16, 42:22, 44:10
**government's** [2] - 17:14, 31:19
**grand** [1] - 12:23
**group** [1] - 7:16
**guess** [1] - 45:4
**guidelines** [6] - 33:2, 33:19, 37:19, 37:21, 38:20, 38:24
**guilt** [4] - 22:25, 26:11, 26:16, 31:11
**guilty** [67] - 3:6, 4:6, 4:8, 13:15, 15:3, 15:8, 15:11, 16:4, 16:6, 16:10, 16:22, 17:6, 17:9, 17:14, 26:25, 28:7, 28:18, 28:20, 28:21, 28:24, 29:2, 29:7, 29:13, 29:20, 29:21, 30:14, 31:22, 31:24, 32:1, 32:9, 32:14, 32:22, 32:23, 33:9, 33:16, 33:17, 33:18, 33:22, 34:3, 34:7, 34:20, 35:2, 35:11, 38:4, 38:10, 39:13, 39:16, 39:20, 39:24, 40:6, 40:8, 40:12, 40:13, 40:19, 40:23, 41:11, 41:13, 41:20, 41:23,

42:3, 43:12, 43:13, 43:16, 43:19, 43:23
**Haldeman** [1] - 18:4
**handle** [1] - 25:7
**harm** [1] - 45:10
**health** [1] - 27:5
**healthcare** [17] - 13:3, 13:16, 14:17, 14:18, 22:15, 27:8, 28:21, 33:24, 34:7, 34:10, 34:12, 34:13, 34:18, 35:23, 35:24, 36:2, 43:8
**hear** [2] - 11:21, 11:23
**heard** [1] - 41:10
**hearing** [5] - 11:8, 11:10, 11:19, 11:20
**heart** [1] - 23:7
**heating** [1] - 25:21
**helped** [1] - 8:23
**helpful** [1] - 3:25
**helping** [2] - 9:8, 11:4
**himself** [1] - 23:3
**history** [3] - 20:10, 23:6, 38:4
**hold** [4] - 20:2, 20:24, 22:3, 40:16
**home** [1] - 20:13
**Honor** [32] - 3:4, 4:19, 13:11, 13:14, 15:5, 15:9, 15:12, 15:15, 15:18, 15:22, 16:2, 16:7, 16:11, 16:14, 17:1, 17:4, 17:7, 17:20, 20:4, 21:1, 35:16, 41:17, 41:18, 41:21, 41:22, 42:1, 42:2, 42:8, 42:9, 42:12, 42:23, 44:9, 44:16
**HONORABLE** [1] - 1:10
**hospitalized** [1] - 6:7
**hours** [2] - 5:11, 6:5
**Howard** [1] - 9:23
**hypertension** [2] - 9:16, 9:17
**hypoxia** [1] - 9:23
**IBC** [11] - 19:24, 20:19, 20:21, 20:22, 21:12, 23:11, 23:15, 23:23, 24:9, 24:23, 27:14
**identification** [1] - 30:21
**identified** [4] - 19:25, 20:22, 21:25, 27:21
**II** [10] - 13:4, 13:18, 19:16, 21:22, 28:25, 33:25, 34:24, 36:6, 36:7, 36:17
**ill** [1] - 12:4
**illness** [1] - 6:8
**illnesses** [1] - 10:2
**immediate** [1] - 4:14
**immediately** [2] - 4:11, 11:24
**important** [1] - 24:15
**impose** [8] - 15:24, 32:24, 33:6, 37:23, 38:8, 38:16, 38:23, 39:24
**imposed** [2] - 33:1, 39:6
**imprisonment** [7] - 36:3,

36:9, 36:25, 37:7, 37:11, 39:14, 39:17
**include** [3] - 22:17, 30:19, 38:3
**included** [2] - 18:25, 21:20
**includes** [2] - 13:25, 32:18
**including** [8] - 17:22, 18:7, 21:8, 23:22, 31:3, 37:15, 38:19, 41:3
**increased** [4] - 23:12, 25:25, 39:14, 39:16
**incriminate** [1] - 31:15
**Independence** [2] - 1:15, 19:24
**indicated** [1] - 18:15
**indicating** [1] - 26:7
**indication** [1] - 18:10
**indictment** [9] - 12:21, 13:2, 19:3, 19:25, 20:23, 21:25, 34:19, 39:15, 44:17
**individual** [1] - 34:16
**induce** [2] - 16:5, 16:9
**ineffective** [1] - 33:3
**inexpensive** [1] - 18:13
**inference** [1] - 31:10
**inflammatories** [2] - 18:14, 19:1
**information** [2] - 20:19, 28:6
**initial** [1] - 23:25
**injury** [2] - 20:8, 41:4
**innocent** [2] - 29:17, 29:25
**inquire** [1] - 25:11
**inquiries** [1] - 25:7
**insisted** [2] - 25:17, 25:20
**insomnia** [1] - 18:16
**instructed** [3] - 4:17, 24:13, 25:2
**instruction** [1] - 23:9
**Insurance** [1] - 25:8
**insurance** [10] - 18:8, 18:9, 18:16, 18:19, 19:18, 23:12, 24:9, 25:5, 27:5, 27:7
**insurers** [1] - 27:8
**intent** [1] - 34:13
**intentionally** [1] - 35:6
**introduce** [2] - 22:11, 27:13
**investigating** [1] - 19:23
**investigation** [2] - 27:21, 43:24
**involves** [1] - 44:21
**ISIS** [1] - 23:2
**issued** [1] - 28:2
**issues** [1] - 32:22
**items** [2] - 34:12, 34:15
**IV** [16] - 13:4, 13:18, 18:7, 18:15, 19:2, 20:17, 21:20, 23:18, 28:25, 33:25, 34:24, 36:14, 36:18, 37:3, 37:4, 37:5

**jail** [4] - 26:13, 26:17, 26:20, 27:2
**James** [1] - 1:7
**January** [2] - 1:8, 27:16
**Jews** [3] - 23:3, 26:13, 27:2
**judge** [1] - 29:6
**judgment** [1] - 33:17
**July** [7] - 12:23, 29:6, 29:10, 31:18, 31:22, 40:16
**jury** [7] - 12:23, 29:6, 29:10, 31:18, 31:22, 40:16
**justification** [1] - 25:15
**kickback** [1] - 27:9
**kilograms** [2] - 14:22
**kind** [4] - 16:4, 22:23, 33:11, 40:17
**knees** [1] - 10:19
**knowingly** [4] - 4:3, 34:9, 35:6
**last** [7] - 5:6, 5:11, 6:5, 6:16, 6:25, 7:1, 16:17
**law** [4] - 32:19, 38:12, 39:21, 42:6
**lawyer** [3] - 4:13, 25:6, 32:4
**LEAHY** [33] - 1:14, 13:11, 13:14, 14:10, 14:13, 17:20, 19:11, 19:13, 19:15, 20:6, 21:3, 21:16, 21:19, 22:8, 22:20, 26:15, 26:19, 26:21, 26:25, 27:20, 35:16, 35:19, 35:23, 36:14, 36:17, 36:20, 36:22, 41:17, 41:21, 42:1, 42:8, 42:12, 42:22
**Leahy** [10] - 13:9, 15:20, 15:25, 17:8, 17:13, 17:19, 28:9, 35:13, 37:15, 41:15
**leaned** [1] - 26:12
**least** [2] - 14:22, 21:12
**led** [1] - 26:2
**Lee** [3] - 8:5, 8:6, 9:23
**leg** [3] - 5:16, 7:20, 9:24
**legal** [2] - 42:7, 43:20
**legitimate** [10] - 13:6, 13:21, 18:2, 18:22, 22:14, 28:4, 29:2, 34:2, 35:1, 43:11
**less** [3] - 14:22, 38:23, 45:8
**level** [2] - 14:16, 15:2
**levels** [1] - 23:8
**Lexapro** [4] - 6:19, 7:24, 8:14, 9:7
**license** [1] - 40:24
**licensed** [1] - 17:23
**lidocaine** [1] - 24:23
**lifetime** [4] - 36:10, 37:1, 37:7, 37:12
**limited** [2] - 14:8, 17:22
**lined** [1] - 44:22
**list** [2] - 9:12, 9:14
**listen** [1] - 17:15
**located** [1] - 18:4
**looking** [1] - 22:23

**loss** [6] - 11:8, 11:9, 11:10, 11:20, 14:18, 41:4
**lungs** [1] - 23:7
**machine** [1] - 25:15
**main** [1] - 10:4
**Mall** [1] - 1:15
**management** [2] - 5:7, 27:24
**Management** [1] - 18:3
**mandatory** [5] - 35:15, 37:16, 40:4, 42:6, 43:20
**manner** [1] - 30:16
**marc@neffsedacca.com** [1] - 2:5
**March** [2] - 21:4, 21:11
**Marie** [2] - 1:21, 45:24
**marijuana** [1] - 14:21
**MARK** [1] - 2:3
**Mark** [2] - 3:12, 4:21
**Market** [1] - 1:7
**markup** [1] - 18:17
**MARY** [1] - 1:14
**mary.beth.leahy@usdoj. gov** [1] - 1:17
**mask** [1] - 9:23
**matter** [3] - 3:6, 32:17, 45:21
**maximum** [13] - 32:25, 35:14, 35:24, 36:3, 36:8, 36:24, 37:6, 37:10, 37:15, 39:20, 40:4, 42:5, 43:20
**MD** [1] - 27:23
**mean** [1] - 10:4
**meaning** [1] - 32:15
**meaningful** [1] - 18:21
**means** [2] - 12:3, 17:10
**medical** [24] - 5:1, 13:6, 13:22, 17:23, 18:2, 18:3, 18:8, 18:9, 18:21, 18:22, 20:10, 20:11, 21:7, 22:14, 22:16, 23:6, 23:17, 24:15, 27:22, 28:4, 29:2, 34:15, 35:1, 43:11
**Medical** [1] - 5:3
**medically** [7] - 18:10, 18:11, 19:6, 19:18, 21:13, 22:15, 27:5
**Medicare** [1] - 27:14
**medication** [2] - 19:21, 22:23
**medications** [11] - 5:12, 5:13, 6:12, 10:23, 18:9, 20:12, 20:14, 20:20, 21:8, 23:17, 24:25
**medicine** [3] - 5:10, 27:24, 40:25
**member** [2] - 19:25, 20:22
**memorandum** [1] - 17:15
**mental** [1] - 6:8
**mentate** [1] - 11:6
**microphone** [2] - 3:24, 7:7
**might** [4] - 7:9, 32:7, 38:13

**mild** [3] - 11:8, 11:10, 11:19
**milligram** [1] - 24:12
**milligrams** [8] - 8:15, 8:16, 21:22, 23:5, 23:13, 23:21, 24:3, 24:21
**million** [7] - 13:24, 13:25, 14:1, 14:5, 36:10, 37:2, 37:12
**minimum** [12] - 27:25, 35:15, 36:9, 36:25, 37:7, 37:10, 37:11, 37:16, 40:4, 42:6, 43:21
**minor** [2] - 10:2, 20:8
**Missouri** [1] - 42:15
**mistake** [1] - 21:17
**Mitchell** [2] - 1:21, 45:24
**mixture** [1] - 35:4
**moment** [1] - 15:20
**money** [5] - 26:11, 44:22, 45:7, 45:9, 45:13
**month** [2] - 6:17, 9:2
**monthly** [1] - 21:10
**months** [4] - 6:17, 8:20, 10:25, 44:19
**morning** [2] - 3:2, 3:4
**most** [1] - 5:4
**mostly** [1] - 10:20
**Motrin** [2] - 5:17, 5:18
**move** [2] - 3:24, 7:7
**MR** [15] - 15:5, 15:9, 20:4, 21:1, 22:6, 41:18, 41:22, 42:2, 42:9, 42:13, 42:19, 42:23, 44:9, 44:13, 44:16
**MS** [32] - 13:11, 13:14, 14:10, 14:13, 17:20, 19:11, 19:13, 19:15, 20:6, 21:3, 21:16, 21:19, 22:8, 22:20, 26:15, 26:19, 26:21, 26:25, 27:20, 35:16, 35:19, 35:23, 36:14, 36:17, 36:20, 36:22, 41:17, 41:21, 42:1, 42:8, 42:12, 42:22
**multiple** [1] - 18:18
**muscle** [3] - 18:14, 19:1, 24:18
**Nalfon** [1] - 23:15
**name** [7] - 3:10, 4:20, 9:10, 9:25, 10:8, 18:3, 25:6
**nature** [1] - 38:3, 42:5
**necessary** [3] - 4:15, 18:11, 19:6
**necessity** [2] - 18:22, 27:22
**need** [7] - 38:6, 38:7, 38:8, 38:10, 38:11, 38:12
**needed** [1] - 26:10
**Neff** [16] - 4:15, 12:13, 12:16, 15:7, 15:11, 16:20, 16:24, 20:3, 20:25, 22:4, 33:2, 37:18, 40:2, 41:15, 42:14, 44:7

**NEFF** [17] - 2:2, 2:3, 15:5, 15:9, 20:4, 21:1, 22:6, 41:18, 41:22, 42:2, 42:9, 42:13, 42:19, 42:23, 44:9, 44:13, 44:16
**Neff's** [1] - 12:18
**nerve** [2] - 10:15, 10:16
**net** [1] - 27:10
**nevertheless** [1] - 20:11
**news** [1] - 22:25
**next** [3] - 25:3, 25:10, 44:19
**NO** [1] - 1:3
**noncontrolled** [1] - 19:9
**Norvasc** [1] - 5:15
**noted** [1] - 24:9
**notes** [1] - 24:16
**notice** [1] - 41:7
**notified** [1] - 14:25
**November** [1] - 16:17
**Number** [1] - 43:7
**number** [2] - 25:5, 25:9
**oath** [1] - 3:19
**object** [2] - 30:10, 38:18
**obtain** [1] - 27:7
**obtained** [5] - 21:21, 23:20, 24:20, 27:10, 30:16
**obtaining** [1] - 21:6
**occasionally** [1] - 5:17
**occur** [1] - 41:11
**offense** [1] - 14:16
**offenses** [5] - 37:9, 38:3, 38:9, 40:11, 44:3
**offer** [1] - 30:11
**offered** [2] - 22:24, 30:11
**offers** [1] - 42:16
**office** [2] - 19:11, 40:16
**OFFICE** [1] - 1:14
**Official** [2] - 1:22, 45:24
**often** [1] - 8:16
**ointment** [1] - 24:23
**old** [1] - 4:22
**once** [1] - 8:18
**One** [1] - 1:15
**one** [8] - 6:15, 6:21, 10:24, 12:11, 36:18, 37:4, 37:22, 44:13
**operated** [1] - 18:3
**operation** [2] - 25:1, 25:9
**opine** [1] - 28:1
**opportunity** [4] - 12:15, 38:18, 42:24, 43:3
**order** [5] - 3:1, 41:3, 41:7, 43:24, 45:16
**original** [1] - 39:14
**osteo** [1] - 10:18
**osteoarthritis** [2] - 10:1, 10:19
**outside** [8] - 13:5, 13:20, 22:13, 28:3, 29:1, 34:1,

34:25, 43:9
**oxycodone** [19] - 19:15, 19:20, 21:5, 21:6, 21:21, 23:5, 23:10, 23:13, 23:19, 23:21, 24:1, 24:2, 24:12, 24:19, 24:21, 25:25, 35:7, 36:7, 36:24
**PA** [1] - 1:8
**pad** [1] - 25:21
**page** [3] - 14:11, 14:15, 16:21
**pages** [1] - 17:14
**paid** [3] - 14:3, 20:21, 22:22
**pain** [6] - 5:7, 5:20, 7:22, 18:15, 24:18, 27:23
**Pain** [1] - 18:3
**paper** [1] - 24:15
**paperwork** [2] - 26:6, 26:10
**parole** [2] - 39:1, 39:2
**paroxysmal** [1] - 9:16
**part** [1] - 25:1
**participate** [1] - 29:10
**participated** [1] - 34:10
**parties** [1] - 14:14
**passport** [1] - 44:24
**patches** [3] - 20:15, 21:9, 24:19
**Patient** [2] - 21:14, 21:15
**patient** [5] - 18:11, 18:19, 18:24, 19:7, 21:3
**patient's** [1] - 19:18
**patients** [4] - 19:17, 19:21, 22:2, 27:22
**patients'** [1] - 18:8
**PAUL** [1] - 1:10
**pay** [3] - 13:23, 27:9, 44:21
**payment** [1] - 34:11
**PC** [1] - 2:2
**penalties** [8] - 3:21, 13:24, 14:1, 14:3, 37:10, 37:15, 40:21, 44:20
**penalty** [10] - 35:14, 35:15, 37:16, 40:4, 42:5, 42:6, 43:20, 43:21
**PENNSYLVANIA** [1] - 1:1
**Pennsylvania** [5] - 1:16, 2:4, 5:3, 17:24, 18:5
**people** [1] - 24:16
**per** [2] - 14:2, 24:24
**percent** [1] - 27:10
**perfectly** [1] - 45:12
**perform** [1] - 20:10
**period** [1] - 45:9
**perjury** [1] - 3:21
**permitted** [2] - 17:25, 39:21
**Person** [68] - 19:25, 20:3, 20:9, 20:11, 20:13, 20:18, 20:22, 20:25, 21:4, 21:5, 21:7, 21:8, 21:15, 21:16, 21:20, 22:1, 22:4, 22:5, 22:8,

22:18, 22:21, 22:22, 23:6, 23:7, 23:11, 23:13, 23:14, 23:18, 23:20, 23:25, 24:1, 24:3, 24:9, 24:10, 24:13, 24:17, 24:20, 25:1, 25:4, 25:6, 25:10, 25:11, 25:13, 25:14, 25:17, 25:20, 25:24, 25:25, 26:2, 26:4, 26:6, 26:8, 26:9, 26:12, 26:17, 27:1, 28:2
**person** [1] - 20:6
**personal** [1] - 41:4
**personally** [1] - 25:4
**persuade** [2] - 16:5, 16:9
**pertinent** [1] - 38:5
**petition** [1] - 32:23
**ph)** [1] - 11:9
**pharmacy** [1] - 24:18
**Philadelphia** [4] - 1:8, 1:16, 2:4, 18:4
**phone** [1] - 25:4
**physical** [3] - 20:10, 25:12, 30:20
**physically** [1] - 12:1
**physician** [6] - 5:8, 6:11, 6:12, 21:4, 24:10, 45:1
**pill** [4] - 5:15, 19:16, 22:1
**pill-seeking** [2] - 19:16, 22:1
**pills** [3] - 5:11, 24:2, 24:12
**pinched** [1] - 10:16
**plan** [2] - 9:3, 34:14
**plea** [43] - 3:6, 4:2, 4:4, 13:9, 13:13, 13:15, 14:2, 14:11, 15:4, 15:8, 15:11, 16:4, 16:12, 16:22, 17:6, 17:9, 17:15, 28:7, 32:14, 32:22, 32:23, 33:10, 33:17, 33:18, 39:13, 39:20, 39:24, 40:13, 40:19, 40:23, 41:16, 41:23, 41:24, 42:3, 42:11, 42:17, 42:21, 43:6, 43:16, 43:17, 43:18, 43:22
**PLEA** [1] - 1:5
**plead** [14] - 4:6, 13:15, 16:6, 16:10, 29:7, 29:12, 33:9, 33:16, 41:11, 41:12, 41:20, 43:12, 43:15
**pleading** [14] - 28:18, 28:20, 28:24, 30:14, 32:9, 33:22, 34:3, 34:7, 34:20, 35:2, 35:11, 39:16, 40:6, 40:12
**pled** [2] - 38:4, 38:10
**policy** [1] - 38:5
**poorly** [1] - 23:4
**pose** [1] - 42:21
**posing** [1] - 22:1
**position** [1] - 14:20
**possess** [1] - 40:17
**possible** [5] - 23:9, 40:4, 40:20, 42:5, 43:20

**potential** [1] - 39:16
**power** [1] - 45:5
**practice** [14] - 10:2, 13:5, 13:21, 18:2, 18:3, 22:13, 25:2, 28:3, 29:1, 34:1, 34:25, 40:24, 43:10, 44:25
**prepared** [1] - 1:24
**preparing** [1] - 15:1
**prescribe** [4] - 6:14, 17:25, 21:5, 24:10
**prescribed** [10] - 5:12, 6:20, 18:10, 19:15, 19:22, 22:12, 23:5, 23:13, 23:19, 24:25
**prescribing** [5] - 6:13, 8:1, 8:9, 23:10, 24:2
**prescription** [22] - 10:23, 18:6, 18:13, 18:18, 19:4, 19:9, 19:10, 19:18, 19:22, 20:12, 21:13, 22:16, 22:24, 23:14, 23:21, 23:22, 25:13, 25:25, 27:14, 27:18, 27:20, 27:25
**prescriptions** [5] - 21:6, 21:21, 24:4, 24:21, 28:2
**presence** [1] - 30:4
**present** [3] - 31:3, 44:7, 44:13
**presented** [2] - 23:11, 45:5
**presentence** [4] - 33:20, 38:17, 38:18, 43:24
**pressure** [5] - 5:14, 5:15, 7:19, 7:23, 23:7
**presumed** [1] - 29:17
**presumption** [4] - 44:4, 44:8, 45:11, 45:14
**pretty** [2] - 15:16, 17:2
**previous** [1] - 24:10
**prison** [5] - 23:4, 27:2, 39:3, 39:6, 39:7
**private** [3] - 14:20, 27:7, 34:14
**privately** [1] - 4:15
**probation** [1] - 43:25
**problem** [2] - 10:10, 23:2
**proceed** [1] - 17:20
**proceeding** [2] - 3:5, 17:10
**Proceedings** [2] - 1:24, 45:18
**proceedings** [3] - 3:15, 12:7, 45:21
**proceeds** [1] - 27:10
**producing** [2] - 36:2, 36:24
**professional** [10] - 13:5, 13:21, 18:1, 22:13, 28:3, 29:1, 34:1, 34:25, 40:24, 43:10
**profit** [1] - 18:21
**profound** [1] - 45:8
**program** [2] - 34:11, 34:14
**programs** [1] - 22:15

**promise** [1] - 16:3
**promises** [1] - 43:17
**promote** [1] - 38:11
**properties** [1] - 44:21
**property** [2] - 41:4, 41:7
**prosecution** [1] - 32:17
**protect** [1] - 38:12
**protection** [1] - 5:17
**prove** [7] - 17:21, 29:20, 29:25, 34:8, 34:17, 35:3, 35:9
**provide** [4] - 23:8, 38:7, 38:9, 38:10
**provided** [6] - 24:24, 25:8, 33:2, 34:16, 38:24, 42:6
**providers** [2] - 18:8, 18:16
**provides** [1] - 28:6
**provision** [1] - 32:19
**psoriasis** [2] - 10:21, 11:4
**psychiatrist** [3] - 6:11, 6:23, 7:17
**psychologist** [3] - 6:11, 6:24, 7:4
**public** [4] - 14:20, 34:14, 38:12, 40:16
**punishment** [1] - 38:9
**purported** [1] - 25:10
**purportedly** [1] - 25:3
**purpose** [7] - 3:5, 13:6, 13:22, 18:2, 18:23, 21:6, 22:14, 28:4, 29:2, 35:1, 43:11
**purposes** [1] - 34:2
**pursue** [1] - 14:5
**pusher** [1] - 23:1
**quantities** [1] - 18:12
**quazepam** [5] - 19:3, 20:16, 21:9, 35:8, 37:5
**questions** [10] - 3:16, 3:17, 3:20, 4:1, 4:7, 4:18, 10:7, 15:13, 16:24, 42:21
**quote/unquote** [1] - 24:11
**radicular** [1] - 10:12
**Rafe** [1] - 11:9
**raise** [2] - 31:4, 32:22
**RDR** [2] - 1:21, 45:24
**read** [5] - 5:23, 17:14, 17:15, 22:19, 26:14
**reading** [1] - 26:22
**reasonable** [6] - 17:21, 29:21, 31:4, 34:9, 35:3, 35:9
**reasonably** [1] - 44:5
**rebut** [1] - 44:7
**rebuttable** [1] - 44:3
**receive** [3] - 15:1, 25:17, 39:20
**received** [1] - 12:21
**recent** [1] - 5:5
**recently** [1] - 6:10

**recess** [1] - 4:14
**recommends** [1] - 39:25
**record** [4] - 3:11, 41:25, 43:18, 45:21
**recorded** [1] - 22:10
**recordings** [2] - 22:11, 22:17
**records** [1] - 21:7
**recruited** [1] - 21:25
**refer** [1] - 27:7
**referrals** [1] - 27:12
**referred** [3] - 19:8, 19:11, 24:12
**referring** [2] - 19:20, 23:3
**refuse** [1] - 20:14
**refused** [2] - 21:4, 24:9
**regarding** [1] - 24:25
**registered** [1] - 17:24
**regular** [1] - 9:25
**reimbursement** [1] - 19:5
**relating** [1] - 32:17
**relatively** [2] - 10:1, 12:2
**relaxer** [1] - 24:18
**relaxers** [2] - 18:14, 19:1
**release** [11] - 35:25, 36:4, 36:9, 36:10, 37:1, 37:8, 37:11, 37:12, 39:6, 39:9, 39:13
**released** [2] - 39:2, 39:7
**relevant** [1] - 38:19
**relief** [1] - 32:23
**RelyyT** [2] - 20:15, 21:9
**remain** [1] - 44:11
**render** [2] - 20:10, 23:17
**rendered** [2] - 19:19, 22:16
**repeated** [1] - 20:13
**report** [4] - 33:20, 38:17, 38:18, 43:24
**reported** [1] - 20:9
**Reporter** [1] - 1:22, 45:24
**reporting** [1] - 44:18
**represent** [2] - 12:11, 32:4
**representation** [1] - 12:19
**represented** [1] - 12:6
**Representing** [2] - 1:18, 2:6
**request** [1] - 25:25
**Requip** [1] - 5:15
**required** [1] - 29:20
**requirements** [1] - 44:18
**reschedule** [1] - 25:2
**respect** [1] - 38:11
**respectfully** [1] - 28:5
**respond** [1] - 4:17
**responded** [1] - 24:5
**RESPONSE** [1] - 3:4
**responsibility** [1] - 14:24
**restitution** [5] - 13:25, 38:7, 41:3, 41:4, 44:20
**restless** [3] - 5:16, 7:19, 9:24
**result** [2] - 25:12, 43:16

**reverse** [1] - 32:7
**review** [4] - 14:9, 15:11, 16:20, 38:19
**reviewed** [1] - 38:2
**revoked** [2] - 39:10, 39:14
**rice** [1] - 23:3
**rights** [14] - 4:4, 14:7, 16:21, 32:15, 33:11, 38:2, 40:7, 40:9, 40:15, 41:10, 41:12, 42:7, 43:20
**rise** [1] - 3:7
**risk** [4] - 44:24, 45:3, 45:8, 45:15
**RMR** [2] - 1:21, 45:24
**room** [1] - 26:3
**safety** [1] - 44:5
**satisfied** [8] - 12:18, 41:15, 41:17, 41:18, 41:19, 41:23, 42:3, 42:10
**satisfy** [4] - 4:2, 4:3, 4:8, 44:19
**Schedule** [24] - 13:4, 13:18, 18:7, 18:14, 19:2, 19:16, 20:16, 21:20, 21:22, 23:18, 28:25, 33:25, 34:24, 36:6, 36:7, 36:14, 36:17, 36:18, 37:3, 37:4, 37:5
**scheme** [1] - 34:10
**school** [3] - 4:24, 4:25, 5:1
**SCICCHITANO** [1] - 1:15
**seated** [4] - 3:3, 3:14, 26:3, 43:14
**second** [6] - 20:2, 20:24, 22:3, 23:11, 34:12, 35:5
**Section** [3] - 13:17, 13:19, 44:1
**secure** [1] - 34:18, 35:9
**security** [1] - 45:17
**SEDACCA** [1] - 2:2
**see** [1] - 15:3
**seeing** [1] - 7:3
**seeking** [2] - 19:16, 22:1
**selection** [1] - 29:10
**self** [1] - 5:6
**self-employed** [1] - 5:6
**selling** [1] - 44:21
**sensory** [1] - 11:6
**sent** [2] - 39:3, 39:5
**sentence** [21] - 14:8, 15:23, 32:16, 32:24, 33:6, 33:7, 33:18, 35:24, 35:25, 36:3, 36:8, 36:25, 37:6, 37:22, 38:8, 38:16, 38:23, 38:24, 39:20, 39:25
**Sentencing** [1] - 38:5
**sentencing** [10] - 13:24, 14:3, 33:1, 33:19, 37:19, 38:6, 38:20, 42:25, 43:25, 44:23
**serve** [1] - 40:16

**services** [6] - 12:10, 19:19, 22:16, 25:24, 34:12, 34:16
**set** [6] - 17:10, 32:13, 37:15, 38:1, 39:12, 43:25
**several** [1] - 18:25
**severe** [3] - 38:23, 38:24, 39:24
**shot** [1] - 11:1
**shots** [1] - 10:24
**show** [1] - 21:7
**showing** [3] - 22:12, 22:25, 24:4
**shows** [1] - 45:11
**shutting** [1] - 24:16
**sic** [1] - 23:22
**side** [1] - 23:10
**sign** [2] - 26:4, 26:9
**signature** [1] - 16:15
**signed** [6] - 16:12, 16:17, 17:5, 17:6, 26:6, 38:2
**significant** [1] - 18:17
**site** [1] - 24:18
**situational** [2] - 8:22, 8:23
**sleep** [4] - 6:21, 8:3, 8:8, 9:22
**social** [2] - 6:12, 6:24
**sorry** [7] - 7:6, 10:6, 10:13, 21:16, 26:21, 26:22, 36:21
**sought** [1] - 20:7
**special** [7] - 35:14, 36:1, 36:5, 36:10, 37:2, 37:8, 37:12
**specified** [1] - 14:11
**stable** [1] - 11:12
**staff** [1] - 19:11
**stage** [1] - 12:6
**standards** [1] - 27:25
**start** [1] - 7:11
**state** [3] - 3:10, 13:12, 35:13
**statement** [1] - 3:21
**statements** [1] - 38:5
**STATES** [2] - 1:1, 1:3
**States** [4] - 1:18, 13:17, 13:19, 17:21
**status** [1] - 40:24
**Statute** [1] - 44:1
**statutory** [6] - 32:24, 35:24, 36:3, 36:20, 36:24, 37:10
**steal** [1] - 45:9
**stenographically** [1] - 1:24
**Stephen** [1] - 27:23
**still** [1] - 41:12
**stimulation** [1] - 25:14
**stipulation** [4] - 14:17, 14:19, 14:20, 14:23
**stipulations** [8] - 13:13, 14:12, 14:13, 14:16, 15:7, 15:19, 15:21, 15:24
**stock** [1] - 18:20

**stocked** [1] - 18:12
**stolen** [1] - 45:7
**Stollsteimer** [2] - 10:11, 10:19
**stopped** [1] - 7:4
**Street** [3] - 1:7, 1:16, 2:3
**street** [1] - 24:6
**subject** [2] - 3:21, 44:3
**submits** [1] - 28:5
**submitted** [7] - 18:8, 19:5, 21:12, 22:14, 27:4, 27:11, 27:17
**submitting** [1] - 19:17
**subpoena** [1] - 30:24
**subsequent** [3] - 23:20, 24:20, 26:1
**substance** [10] - 19:16, 21:22, 23:19, 35:4, 35:5, 35:6, 35:7, 36:8, 37:3, 44:3
**substances** [17] - 13:5, 13:18, 13:20, 18:1, 18:7, 18:15, 19:2, 20:17, 21:20, 22:12, 28:1, 28:25, 34:1, 34:25, 36:6, 37:6, 43:9
**substantial** [2] - 45:9, 45:14
**suggesting** [1] - 43:1
**suggestion** [1] - 31:11
**Suite** [2] - 1:15, 2:4
**summarize** [2] - 22:17, 22:19
**summarized** [1] - 15:20, 28:6
**summary** [1] - 12:25
**supervised** [11] - 35:25, 36:4, 36:9, 36:10, 37:1, 37:7, 37:11, 37:12, 39:6, 39:9, 39:13
**supplement** [1] - 17:17
**supports** [1] - 45:14
**Supreme** [1] - 42:14
**surgery** [1] - 26:22
**swear** [1] - 3:8
**sworn** [2] - 3:9, 3:19
**syndrome** [1] - 10:12
**taxes** [1] - 40:21
**term** [3] - 39:6, 39:14, 39:17
**terms** [8] - 13:12, 13:14, 14:2, 15:7, 15:19, 15:20, 39:10, 42:17
**testify** [9] - 20:1, 20:6, 27:4, 27:15, 27:24, 30:4, 31:7, 31:8, 31:12
**testimony** [1] - 31:4
**The Court** [192] - 3:2, 3:5, 3:14, 3:19, 3:24, 4:6, 4:10, 4:13, 4:17, 4:20, 4:22, 4:24, 5:2, 5:4, 5:8, 5:10, 5:13, 5:18, 5:20, 5:22, 6:1, 6:4, 6:7, 6:10, 6:18, 6:20, 6:23, 7:2, 7:6, 7:11, 7:14, 7:16, 7:19, 7:22, 7:24, 8:1, 8:4, 8:6, 8:8, 8:11, 8:14, 8:16,

8:19, 8:21, 8:23, 9:1, 9:4, 9:7, 9:10, 9:13, 9:17, 9:21, 10:3, 10:6, 10:13, 10:17, 10:23, 11:1, 11:3, 11:7, 11:10, 11:14, 11:16, 11:18, 11:23, 12:1, 12:3, 12:5, 12:9, 12:11, 12:13, 12:15, 12:18, 12:21, 12:25, 13:9, 13:12, 14:9, 14:12, 15:3, 15:6, 15:10, 15:13, 15:16, 15:19, 15:23, 16:3, 16:8, 16:12, 16:15, 16:17, 16:20, 16:24, 17:2, 17:5, 17:8, 19:8, 19:12, 19:14, 20:2, 20:5, 20:24, 21:2, 21:15, 21:18, 22:3, 22:7, 22:19, 26:14, 26:18, 26:20, 26:24, 27:19, 28:8, 28:12, 28:14, 28:17, 28:20, 28:24, 29:5, 29:9, 29:12, 29:16, 29:19, 29:24, 30:2, 30:6, 30:9, 30:14, 30:18, 30:23, 31:2, 31:6, 31:10, 31:14, 31:17, 31:18, 31:21, 31:24, 32:3, 32:6, 32:9, 32:13, 32:21, 33:5, 33:9, 33:14, 33:16, 33:22, 34:5, 34:22, 35:13, 35:18, 35:20, 36:13, 36:16, 36:19, 36:21, 37:14, 37:18, 37:21, 37:25, 38:15, 38:22, 39:1, 39:5, 39:9, 39:12, 39:19, 39:23, 40:2, 40:6, 40:11, 40:19, 40:23, 41:2, 41:6, 41:10, 41:15, 41:19, 41:23, 42:3, 42:10, 42:14, 42:20, 42:24, 43:6, 43:14, 44:10, 44:12, 44:15, 45:4
**therapist** [1] - 25:18
**thinner** [1] - 9:19
**third** [2] - 34:13, 35:6
**Thomas** [2] - 27:23, 28:1
**threat** [2] - 44:25, 45:2
**threatened** [1] - 16:8
**threats** [1] - 43:17
**three** [6] - 8:20, 10:3, 16:21, 24:11, 34:17, 35:9
**three-page** [1] - 16:21
**throw** [2] - 26:12, 26:17
**thrown** [2] - 26:20, 27:1
**timely** [1] - 14:25
**Title** [2] - 13:16, 13:19
**today** [9] - 3:5, 28:18, 34:3, 34:8, 34:20, 35:2, 35:11, 40:12, 44:13
**topical** [2] - 18:13, 19:1
**total** [4] - 35:19, 37:9, 37:15, 39:16
**totaling** [1] - 27:17
**totalling** [1] - 21:12
**tote** [4] - 20:12, 20:20, 23:14,

24:22
**tramadol** [7] - 19:3, 20:16, 21:10, 23:15, 23:18, 35:7, 37:5
**Tramazole** [1] - 23:22
**transcript** [1] - 45:20
**transcription** [1] - 1:24
**travelers** [1] - 25:8
**Travelers** [3] - 25:16, 25:19, 25:21
**treated** [5] - 6:7, 6:23, 6:24, 10:1, 11:11
**treating** [9] - 7:12, 9:11, 9:15, 10:8, 10:9, 10:12, 10:19, 10:21
**treatment** [3] - 20:7, 24:15, 26:7
**Tremfya** [1] - 11:2
**trial** [20] - 15:1, 17:21, 20:1, 29:16, 29:22, 30:2, 30:12, 30:23, 31:2, 31:6, 31:19, 31:24, 31:25, 32:11, 33:11, 33:14, 34:9, 35:3, 41:12, 43:22
**tried** [2] - 29:6, 29:13
**trust** [1] - 14:20
**truth** [1] - 3:22
**truthful** [1] - 3:17
**try** [2] - 12:10, 20:13
**turned** [1] - 44:24
**two** [13] - 6:25, 7:2, 7:3, 7:4, 7:9, 9:5, 10:25, 21:20, 21:24, 24:7, 24:22, 39:15
**type** [1] - 20:11
**types** [1] - 21:8
**U.S** [2] - 1:7, 1:14
**U.S.C** [1] - 44:1
**unanimously** [1] - 31:22
**under** [11] - 3:19, 6:11, 13:14, 18:3, 32:19, 33:1, 34:15, 38:24, 42:14, 43:7, 44:1
**undercover** [3] - 22:1, 25:1, 25:9
**undergo** [1] - 26:8
**UNITED** [2] - 1:1, 1:3
**United** [4] - 1:18, 13:16, 13:19, 17:21
**unnecessary** [4] - 19:18, 21:13, 22:15, 27:6
**untold** [1] - 45:10
**untruthfully** [1] - 4:18
**unwarranted** [1] - 38:6
**up** [11] - 4:4, 30:15, 32:10, 32:15, 36:9, 37:1, 37:7, 37:11, 39:20, 41:12, 44:22
**upstairs** [1] - 24:14
**upward** [1] - 32:25
**usual** [8] - 13:5, 18:1, 22:13, 25:13, 29:1, 34:1, 34:25,

43:10
**utilizing** [1] - 1:24
**valsartan** [2] - 5:14, 9:17
**valuable** [1] - 40:15
**variance** [1] - 33:1
**various** [1] - 21:8
**vast** [3] - 45:7, 45:9, 45:13
**verdict** [1] - 32:1
**victims** [2] - 38:7, 41:3
**videotape** [1] - 22:10
**violate** [1] - 39:10
**violated** [1] - 40:9
**violation** [2] - 13:16, 13:18
**virtually** [1] - 18:19
**visit** [1] - 24:20
**visits** [1] - 24:20
**voluntarily** [2] - 4:3, 32:14
**voluntary** [2] - 41:20, 43:16
**vote** [1] - 40:15
**waiting** [1] - 26:2
**waive** [2] - 14:6, 33:10
**waiver** [2] - 32:17, 32:18
**waiving** [3] - 32:15, 40:7, 43:21
**Walnut** [1] - 2:3
**weeks** [1] - 9:6
**whispered** [3] - 26:12, 26:17, 27:1
**white** [1] - 23:3
**whole** [1] - 9:14
**wholesale** [1] - 18:12
**William** [2] - 9:25, 10:11
**willingness** [1] - 41:19
**wiretap** [1] - 30:20
**wish** [1] - 43:2
**withdraw** [1] - 39:24
**witnesses** [6] - 30:3, 30:7, 30:10, 30:25, 31:3, 31:4
**word** [1] - 15:11
**worker** [2] - 6:12, 6:24
**worth** [1] - 24:6
**write** [2] - 5:24, 22:24
**written** [1] - 12:22
**year** [4] - 6:25, 7:2, 16:17, 37:7
**years** [18] - 5:7, 7:3, 7:4, 7:9, 11:13, 35:25, 36:3, 36:8, 36:9, 36:25, 37:1, 37:6, 37:10, 37:11, 39:15, 39:17
**yourself** [2] - 6:13, 31:15